· See also 667 F.Supp. 827, 668 F.Supp. 1523, 669 F.Supp. 1563, 827 F.2d 682.

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carlos Enrique LEHDER–RIVAS, a/k/a
Joe Lehder, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carlos Enrique LEHDER–RIVAS, a/k/a
Joe Lehder, Jack Carlton Reed,
Defendants–Appellants.**

**Nos. 88–3344, 88–3596.**

United States Court of Appeals,
Eleventh Circuit.

March 25, 1992.

---

G. Richard Strafer, Miami, Fla., for Carlos Enrique Lehder–Rivas.

Stephen J. Weinbaum, Jacksonville, Fla., for Jack Carlton Reed.

Ernst D. Mueller, Asst. U.S. Atty., Jacksonville, Fla., for U.S. in both cases.

Karla R. Spaulding, Asst. U.S. Atty., Tampa, Fla., for U.S. in case No. 88–3596.

Before COX, Circuit Judge, JOHNSON * and REAVLEY **, Senior Circuit Judges.

JOHNSON, Senior Circuit Judge:

## I. STATEMENT OF THE CASE

### A. *Background Facts*

From early 1978 through 1981, Carlos Enrique Lehder–Rivas (Lehder) served as leader of a cocaine smuggling organization which utilized as its major base for operations the island of Norman's Cay in the Bahamas. Lehder's planes, or those of his pilots, transported cocaine from Colombia to Norman's Cay in loads ranging from 150 to 500 kilograms. Later, on a second leg,

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

usually with different planes and different pilots, the cocaine was flown into Florida or south Georgia. From there the cocaine was driven to "stash houses" in Miami.

Once in Miami, the cocaine was made available to Lehder's network of distributors. Cash proceeds from the cocaine sales were returned to Norman's Cay via Ft. Lauderdale or Miami. The cash was then either deposited in Bahamian banks or transported elsewhere by aircraft. Jack Carlton Reed (Reed) was initially a pilot in this operation and later a supervisor of cocaine distribution. He also became an investor in the cocaine operation and a close advisor to Lehder.

### B. *Procedural History*

On September 18, 1981, Lehder and Reed (appellants) were charged in an eleven count indictment. Count 1 charged Lehder and Reed with engaging in a conspiracy to import cocaine into the United States, in violation of 21 U.S.C.A. § 846 (West 1981 & Supp.1991). Counts 2 through 11 charged Lehder with nine acts of importing and possessing cocaine with intent to distribute, in violation of 21 U.S.C.A. §§ 952 and 841 (West 1981 and Supp.1991), and with engaging in a continuing criminal enterprise (CCE), in violation of 21 U.S.C.A. § 848 (West Supp.1991).

Lehder was arrested in Colombia on February 4, 1987, and was extradited to Jacksonville, Florida. Reed was arrested in Panama on February 6, 1987, and transported to Florida the next day. After a trial spanning seven months, the jury on May 13, 1988 found Reed guilty on Count 1 and Lehder guilty on all eleven counts. On July 20, 1988, Lehder was sentenced to life imprisonment without parole on Count 11 to be served consecutively with 120 years on the remaining ten counts. Lehder was also fined $100,000 and ordered to forfeit

his property to the United States government. Reed was sentenced to 15 years imprisonment and a $25,000 fine.

## II. DISCUSSION

Appellants raise the following principal claims on appeal: (1) the district court improperly admitted evidence extrinsic to the crimes charged in the indictment; (2) the indictment failed to provide Lehder with notice sufficient to allow preparation of an adequate defense; (3) the government violated the terms of Lehder's extradition treaty; (4) the district court improperly denied Reed's motion for severance; (5) the district court erroneously denied Reed's motion to suppress evidence obtained from searches conducted in Mississippi; (6) the district court deprived appellants of their right to a fair trial by failing to effectively address inflammatory and pervasive publicity. We address each of these contentions in turn below.

### A. *Evidence properly admitted under "inextricably intertwined" doctrine*

Appellants argue that the district court erroneously admitted evidence extrinsic to the crimes charged, in violation of Rules 403 and 404(b) of the Federal Rules of Evidence.[1] The crimes at issue occurred from 1978 through early 1981. We review the lower court's evidentiary rulings for abuse of discretion. *United States v. Van Dorn*, 925 F.2d 1331, 1338 n. 12 (11th Cir. 1991).

Evidence of criminal activity other than the charged offense is admissible for purposes of Rule 404(b) if it:

pertain[s] to the chain of events explaining the context, motive and set-up of the crime [and is] linked in time and circumstances with the charged crime, or forms an integral and natural part of the ac-

---

**1.** Appellants also contend that the district court violated Rule 105 by refusing to instruct the jury not to consider the "extrinsic" evidence for purposes of demonstrating the appellants' bad character. *See* Fed.R.Evid. 105. As discussed *infra*, however, the vast majority of the disputed evidence was intrinsic to the crimes charged. A Rule 105 instruction for this evidence was there-

fore not required. *United States v. Martin*, 794 F.2d 1531, 1532 (11th Cir.1986). Because we find that the lower court's few erroneous admissions of extrinsic evidence were harmless, *see infra* discussion, the lower court's failure to provide a Rule 105 instruction in these instances was also harmless.

count of the crime, or is necessary to complete the story of the crime for the jury. *Id.* at 1338; *see United States v. Montes–Cardenas,* 746 F.2d 771, 780 (11th Cir. 1984).[2] Rule 403 requires the exclusion of even intrinsic evidence if its probative value "is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Rule 403, however, must be applied "sparingly.... The 'major function' of Rule 403 'is limited to excluding matters of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.' " *United States v. Cross,* 928 F.2d 1030, 1048 (11th Cir.1991) (citations omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991); *see United States v. Huppert,* 917 F.2d 507, 512 (11th Cir.1990).

■ The government's evidence concerning the formation of the conspiracy prior to 1978 was admissible as "pertain[ing] to a chain of events forming the context, motive and set-up of the crime." *Van Dorn,* 925 F.2d at 1338; *United States v. Mills,* 704 F.2d 1553, 1559 (11th Cir.1983), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984). The government established that George Jung and Lehder met as inmates in 1974 and together began planning to introduce cocaine into the United States. *See United States v. Champion,* 813 F.2d 1154, 1172–73 (11th Cir.1987). The government then linked the conspiracy at its inception to its complex state in 1978 by showing how, during the course of the conspiracy, Jung introduced Lehder to future key conspirators who in turn introduced Lehder to other key conspirators. The roles and motives of the various co-conspirators in Lehder's distribution network from 1978 through 1981 would have been incomprehensible to the jurors had the prosecution failed to trace formation of the conspiracy to its origin with Lehder and Jung. *See id.* This basic "structural" evidence, admissible under Rule 404(b), there-

fore also retains probative value outweighing any danger of unfair prejudice. *See, e.g., United States v. Van Dorn,* 925 F.2d at 1338–39.

■ The district court likewise properly admitted evidence regarding when and how each co-conspirator separated from Lehder and on what terms, even when these separations occurred after early 1981. Carefully circumscribed evidence of criminal activity after the conclusion of the conspiracy may be admissible to "complete the story" of the conspiracy. *See United States v. Gomez,* 927 F.2d 1530, 1534–35 (11th Cir.1991); *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983). In the case at bar, the trial court minimized the possibility of prejudice by instructing the jury before and after such evidence was admitted that the evidence must be considered only "to determine whether the conspiracy and continuing criminal enterprise charged in the indictment in fact existed during the time frame set forth in the indictment." *See United States v. Cardenas,* 895 F.2d 1338, 1344 (11th Cir.1990).

■ Appellants also contend that the government improperly introduced evidence of a number of irrelevant collateral crimes that occurred during the course of the conspiracy. Lehder argues that he suffered prejudice when the government entered evidence of unrelated occurrences such as his deportation from the United States in 1975, his placement on the Bahamian Stop List, his transportation of prostitutes to Norman's Cay, his drug use, his excessive "partying" and his illegitimate child. This Court has found that "[w]hile not all bad acts occurring within the time frame of a conspiracy are automatically admissible, the fact that [they occurred in conjunction with a] co-conspirator during the time of the conspiracy weighs heavily toward finding the acts are intertwined." *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir.1985).

**2.** Rule 404(b) states:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that action in conformity therewith. It may, however, be ad-

missible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We find that most of this evidence was intrinsic to the proof of the conspiracy. Lehder's deportation shaped his smuggling operation by forcing him to operate primarily in neighboring countries and to arrange for supervisors to oversee distribution in the United States. His placement on the Bahamian Stop List, making his continued presence in the Bahamas illegal, significantly affected his method of operation from Norman's Cay. Lehder's transportation of prostitutes to Norman's Cay was primarily for the benefit of his pilots, and thus was relevant to his recruitment of key personnel for the narcotics operation. The fact that Lehder personally used drugs demonstrated his familiarity with cocaine and explained descriptions of his sometimes erratic and paranoid management of the conspiracy. *Cf. United States v. Cardenas*, 895 F.2d at 1344 (evidence of prior drug dealings highly probative of conspiracy to distribute controlled substances). Evidence regarding each of these activities was closely tied to establishing the nature and type of the conspiracy, and therefore possessed a probative value that outweighed the potential for prejudicial harm. *See United States v. Champion*, 813 F.2d at 1172–73.

The government's suggestion to the jury that Lehder engaged in frequent "partying" and that he fathered an illegitimate child during the conspiracy carried prejudice that substantially outweighed its *de minimis* relevance to the case. However,

because the defense itself had described Lehder as a playboy who frequently engaged in excesses, and because the government apparently made reference to his illegitimate child only once and in passing, these errors are harmless. *See United States v. Camejo*, 929 F.2d 610, 616–17 (11th Cir.1991); *United States v. Reed*, 700 F.2d 638, 646 (11th Cir.1983); *see generally Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–231, 11 L.Ed.2d 171 (1963); *Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967).[3]

■■■ Reed also claims that the government improperly introduced evidence of a number of extrinsic and prejudicial collateral bad acts. We find that the district court did not abuse its discretion in admitting the vast majority of this evidence. Evidence regarding his prior drug smuggling from Mexico related to his smuggling experience and qualifications, and ultimately to his importance to the Lehder operation. *See United States v. Cardenas*, 895 F.2d at 1344. Reed's personal use of cocaine revealed his familiarity with the drug and his ability to perform as a pilot. His involvement in extorting money owed by co-conspirators to Lehder's operation, his death threat to a reputed DEA agent stationed on Norman's Cay, and his attempts to force three persons to leave the island revealed the breadth of Reed's participation in Lehder's organization. Reed's

3. Judge Cox in his special concurrence argues that we have conflated the harmless constitutional error standard with a distinguishable harmless error standard for evidentiary errors not rising to the level of a constitutional error. This Circuit has stated that "[t]he standards for determining whether a constitutional violation is harmless are well established. If there is 'a reasonable possibility that the evidence complained of might have contributed to the conviction,' the error is not harmless." *Hutchins v. Wainwright*, 715 F.2d 512, 517 (11th Cir.1983) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–231, 11 L.Ed.2d 171 (1963)). *Fahy* involved a constitutional violation, *id.*, 375 U.S. at 86, 84 S.Ct. at 230, and *Chapman v. California* purported merely to apply the standard previously established in *Fahy*. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. In cases like *Camejo*, 929 F.2d at 617, and *Reed*, 700 F.2d at 646, this Circuit has employed the *Fahy/Chap-*

*man* standard to errors not rising to the level of constitutional errors. Perhaps the *Camejo* and *Reed* Courts should not have placed any reliance on *Fahy* in deciding whether or not the errors at issue warranted reversals; however, such reliance is now an established fact that this Court cannot simply ignore. *See United States v. Machado*, 804 F.2d 1537, 1543 (11th Cir.1986). Thus, this Circuit has employed the *Fahy* standard, and by implication *Chapman*'s gloss of *Fahy*, when evaluating the merits of nonconstitutional evidentiary errors. *Camejo*, 929 F.2d at 617; *Reed*, 700 F.2d at 646. The larger question of whether this standard is substantially different from the Rule 52(a) standard preferred by Judge Cox is an open question in this Circuit. However, because the evidentiary errors in this case are harmless under either standard—assuming for the moment that there is a substantive difference between the two—we need not address the proper resolution of this question.

efforts to introduce a former co-conspirator to cocaine distributors and his stash of weapons on Norman's Cay were also highly probative of Reed's involvement in the smuggling operation. *See, e.g., United States v. Martin,* 794 F.2d at 1532–33. Finally, testimony that Reed planned to leave the island to grow marijuana in Colombia was entered only to explain how Reed and another key co-conspirator parted for the last time. *See United States v. Gomez,* 927 F.2d at 1534–35.

▮▮▮▮ Testimony by two witnesses that Reed purchased and possessed pornography and sexual devices, and by a DEA agent that Reed possessed a false passport while residing in Panama after the conclusion of the conspiracy was prejudicial and of insignificant probative value, *see, e.g., United States v. Cox,* 536 F.2d 65, 71 (5th Cir.1976), and we conclude that it fails the balancing test of Rule 403. The lower court's erroneous admission of this evidence was nevertheless harmless. *See Camejo,* 929 F.2d at 616–17. The evidence was mentioned only in passing and described actions that were trivial in comparison to some of Reed's most egregious conduct as a co-conspirator. *Id.; see United States v. Champion,* 813 F.2d at 1173.

▮▮▮▮ Finally, Lehder contends that the district court erroneously admitted evidence of his views on Hitler and other "revolutionaries" such as Che Guevara, and impermissibly allowed comparisons between Lehder's organization and the Third Reich. The government introduced this evidence primarily to establish Lehder's motives. *See* Fed.R.Evid. 404(b). Lehder consciously imitated Hitler's "organizational genius" in structuring his smuggling operation. He was fascinated by the revolutionaries and hoped that he might facilitate the demise of the United States by importing large quantities of cocaine. Lehder's political views thus explained in part why he continued to smuggle cocaine long after amassing millions of dollars. This evidence was therefore of considerable probative

value in proving Lehder's motives for his continued participation in the conspiracy as well as for articulating the nature and scope of the conspiracy. *See, e.g., United States v. Mills,* 704 F.2d at 1559 (admission of evidence of defendant's membership in Aryan Brotherhood inextricably intertwined with establishing motive for crime); *United States v. Harrell,* 737 F.2d 971, 978 (11th Cir.1984) (testimony about Outlaws Motorcycle Club admissible because it "was important in understanding the existence, motives and object of the drug-trafficking conspiracy").

The potential prejudicial value of references and comparisons to Hitler and the Third Reich is not lost upon this Court, however. Such inflammatory evidence retains a sufficiently countervailing probative value only when less prejudicial evidence fails to describe sufficiently the motive and nature of the crime. *See United States v. Watchmaker,* 761 F.2d 1459, 1471 (11th Cir.1985) (probative value in part is "function of the prosecution's need for the evidence in making its case"). We find that the district court improperly permitted a witness to testify that Lehder planned to mark his share of cocaine packages with swastikas. The government contends that this witness' remark served in part to corroborate related testimony by witnesses with shaky credibility. Mere corroboration of testimony, however, fails to justify the introduction of unrelated bad acts. *United States v. Miller,* 883 F.2d 1540, 1544 (11th Cir.1989), *vacated and en banc review granted on unrelated grounds,* 923 F.2d 158 (11th Cir.1991). Because Lehder's method of labeling his cocaine packages was not critical to the prosecution's establishment of a conspiracy, the district court abused its discretion by admitting this highly prejudicial evidence.

The swastika testimony was nevertheless harmless beyond a reasonable doubt. *See Camejo,* 929 F.2d at 616–17. The witness briefly testified about the labeling and represented only one of the prosecution's 115 witnesses.[4] Moreover, the prejudicial im-

---

4. The prosecutor in his closing argument enhanced the prejudicial impact of this testimony by referring to Lehder as a person who "emulates and admires Adolf Hitler." However, com-

pact of this particular testimony was mitigated by the jury's exposure to similar testimony properly introduced to describe Lehder's motives and the nature of the conspiracy. *See United States v. Prater,* 805 F.2d 1441, 1443–46 (11th Cir.1986).

### B. *Indictment provided constitutionally adequate notice*

 Lehder contends that by allowing the government to rely on eight uncharged predicate offenses, the district court provided him with constitutionally inadequate notice of the particular predicate offenses that the government would seek to prove for the continuing criminal enterprise charge.[5] Due process requires an indictment to provide notice sufficient to allow a defendant to prepare an adequate defense. *United States v. Alvarez–Moreno,* 874 F.2d 1402, 1410 (11th Cir.1989), *cert. denied,* 494 U.S. 1032, 110 S.Ct. 1484, 108 L.Ed.2d 620 (1990). However, " '[a]n indictment charging a [continuing criminal enterprise] is sufficient for constitutional purposes if it articulates in statutory language the elements of the violation.' " *United States v. Martell,* 906 F.2d 555, 558 (11th Cir.1990) (quoting *Alvarez–Moreno,* 874 F.2d at 1410). The government need not provide defendant "with all the overt acts that might be introduced at trial." *Martell,* 906 F.2d at 558.

It is undisputed that the indicted charge of continuing criminal enterprise set forth all of the essential elements of the offense: the indictment "inform[ed Lehder] that the government sought to prove a continuing series of violations of sections 841 ... 952 and 963 of Title 21 from [September 1978] up to and including [September 1980]" and that Counts 1 through 10 of the indictment would be among those violations the government would attempt to prove. *Id.* at 558. Moreover, the eight uncharged predicate acts occurred during the period specified in the CCE charge, and Lehder received advance notice of at least the names of the witnesses who later testified about these predicate acts. *See id.; United States v. Jeffers,* 532 F.2d 1101, 1113 (7th Cir.1976). Lehder's indictment therefore provided him with constitutionally adequate notice.[6]

### C. *The government complied with the terms of the extradition treaty*

 Lehder asserts that he was both tried and sentenced by the United States in violation of the extradition treaty with Colombia. Extradition treaties are governed by the "principle of specialty," a rule developed to preserve international relationships as well as the integrity of the extradition process. *United States v. Diwan,* 864 F.2d 715, 720 (11th Cir.1989); *cert. denied,* 492 U.S. 921, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989). Under the principle of specialty, " 'the requesting state, which secures the surrender of a person, can prosecute that person only for the offense for which he or she was surrendered by the requested state or else must allow that person an

---

ments made incident to closing argument justify a reversal only if they are both improper and prejudicial to a substantial right of the defendant. *United States v. Rodriguez,* 765 F.2d 1546, 1559 (11th Cir.1985). Because the evidence against Lehder was overwhelming, and because this comment had foundation in matters in evidence, the error is not reversible. *See United States v. North,* 910 F.2d 843, 895 (D.C.Cir.1990) (equating defendant to Hitler not reversible error).

5. Appellants also argue that the erroneous admission of extrinsic evidence impermissibly broadened the indictment to include other crimes. *See Stirone v. United States,* 361 U.S. 212, 215–16, 80 S.Ct. 270, 272–73, 4 L.Ed.2d 252 (1960). The critical inquiry is whether appellants have been "convicted of an offense not charged in the indictment." *United States v. Artrip,* 942 F.2d 1568, 1570 (11th Cir.1991). This argument is without merit. The alleged "extrinsic" evidence, save several harmless exceptions, was properly admitted as intrinsic to the indicted crimes. *See supra* section A.

6. Lehder additionally contends that the district court committed reversible error by failing to instruct the jury that (1) the three predicate violations for the CCE charge must be "separate and independent," and (2) the jury must be unanimous in its finding of particular predicate acts before it may find a continuing criminal enterprise. Neither instruction is required. *See United States v. Alvarez–Moreno,* 874 F.2d at 1412; *United States v. Rosenthal,* 793 F.2d 1214, 1226–27 (11th Cir.1986), *modified on unrelated grounds,* 801 F.2d 378 (11th Cir.1986).

opportunity to leave the prosecuting state to which he or she had been surrendered.'" *United States v. Herbage*, 850 F.2d 1463, 1465 (11th Cir.1988), *cert. denied*, 489 U.S. 1027, 109 S.Ct. 1158, 103 L.Ed.2d 217 (1989) (citation omitted). Because the purpose of the rule of specialty is to ensure that the contracting nations faithfully observe the treaty, the extradited person may "raise only those objections to the extradition process that the surrendering country might consider a breach of the extradition treaty." *United States v. Diwan*, 864 F.2d at 721.[7]

Lehder first argues that the Colombia Supreme Court's failure to refer specifically to the CCE charge in its review of the extradition request demonstrates that Colombia never agreed to his prosecution for that crime. This contention is without merit. "[I]f a treaty fairly admits of two constructions, one restricting rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor v. Laubenheimer*, 290 U.S. 276, 293–94, 54 S.Ct. 191, 195–96, 78 L.Ed. 315 (1933); *see also United States v. Wiebe*, 733 F.2d 549, 554 (8th Cir.1984). Although the Colombian Supreme Court enumerated United States Code citations to all the indicted crimes except that of participation in a continuing criminal enterprise, the Court in the same paragraph specifically included the charge of "participating in a criminal enterprise continuously with other persons (narcotics traffic)." Moreover, in its closing "resolves" section the Court granted "favorable judgment" to the extradition "in accordance with the request formulated by the Government of the United States of America." This request included an express reference to the charge of continuing criminal enterprise. We find that the Colombia Supreme Court's omission of the Code citation was merely an oversight or legitimate misunderstanding equivalent to the Court's repeated references to sections of the United States Code as "Articles."

We also find meritless Lehder's assertion that the admission of "extrinsic" evidence at trial permitted his prosecution on charges unauthorized by the extradition treaty. The rule of specialty is not violated when evidence is properly admitted under the inextricably intertwined doctrine "to reflect the scope of the conspiracies, to prove intent, and to aid the jury in determining the nature of the offenses charged." *United States v. Alvarez–Moreno*, 874 F.2d at 1414.[8]

Finally, Lehder argues that his sentence violated the fifteen year maximum sentence authorized by the Colombia Supreme Court. The opinion of the Colombia Supreme Court, however, cites a fifteen year maximum penalty only for violations of "Articles 841, Sections 2, 952, 960, 963 of Titles 18 and 21 of the United States Code." The opinion does not address the penalty for participation "in a criminal enterprise continuously" except to note that the maximum penalties were provided on the face of the indictment. The face of the indictment reveals that a sentence of life imprisonment is possible. Furthermore, Article 15(2)(b) of the Treaty states only that "[t]he defendant is subject to be sentenced to a period of incarceration which does not exceed that provided for the offense for which the person was extradited." Because Lehder was extradited for trial on the CCE charge and other offenses, his sentence of life plus 135 years—representing the maximum sentence possible on each count of conviction consecutively im-

---

**7.** Significantly, Colombia, the surrendering country, has never asserted that Lehder's trial, conviction or sentence violated the extradition treaty. Nonetheless, we assume without deciding that Lehder has standing to allege a violation of the specialty principal. This Circuit has yet to formulate standing requirements for such a challenge, and the facts presented in the case at bar do not require us to decide this question. *See United States v. Herbage*, 850 F.2d at 1466 n. 7.

**8.** Lehder's argument that the government violated the treaty by somehow prosecuting him for fomenting political uprisings in Colombia is utterly meritless. As discussed in *supra* section A, almost all of the so-called "political" evidence was admitted only when it was inextricably intertwined with explaining Lehder's motives for his cocaine operation.

posed—did not violate the terms of the treaty. Thus, even assuming Lehder has standing to raise alleged violations of the treaty, *see supra* note 7, Lehder's arguments lack merit.

### D. *Motion for severance properly denied*

 Reed asserts that the trial court's refusal to sever his trial caused him to suffer prejudice from the spillover effect of the voluminous evidence concerning Lehder. *See* Fed.R.Crim.P. 14. In considering a motion for severance, a court must weigh the prejudice inherent in a joint trial against the interests of judicial economy. *United States v. Eyster*, 948 F.2d 1196, 1213 (11th Cir.1991). " '[S]everance will be granted only if a defendant can demonstrate that a joint trial will result in specific and compelling prejudice to the conduct of his defense.' " *Id.* (quoting *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983), *cert. denied*, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984)). We review the district court's balance of interests for abuse of discretion. *Eyster*, 948 F.2d at 1214.

To prove compelling prejudice Reed must "demonstrate the jury's inability to make an individualized determination as to each defendant." *United States v. Meester*, 762 F.2d 867, 883 (11th Cir.1985); *see United States v. Marszalkowski*, 669 F.2d 655, 660 (11th Cir.1982). The mere fact that Reed was involved in a complex conspiracy involving voluminous evidence pertaining to a co-conspirator is insufficient to demonstrate compelling prejudice. *See United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir.1990); *United States v. Casamayor*, 837 F.2d 1509, 1511 (11th Cir.1988). The trial court in the instant case significantly reduced any possibility of prejudice by instructing the jury to consider each offense and each defendant separately. *See United States v. Smith*, 918 F.2d at 1510. Denial of Reed's motion for severance was therefore not an abuse of discretion.

### E. *Motion to suppress evidence properly denied*

Reed next contends that the district court improperly denied his motion to suppress evidence seized from three locations in Oktibbeha County, Mississippi, in August 1981. The relevant warrants had issued authorizing the search of a farmhouse, a suitcase and a safety deposit box.

 We consider first whether Reed has established standing to challenge the search warrants issued for the farmhouse and for the suitcase. Before challenging the validity of a search, a defendant must demonstrate a legitimate expectation of privacy in the premises searched. *United States v. Gonzalez*, 940 F.2d 1413, 1420 (11th Cir.1991). Reed claims standing to contest the search of the farmhouse because the affidavit in support of the search warrant stated that a man known as Jack Reed controlled and occupied the house. This affidavit, however, was based on the law enforcement officials' erroneous belief that one of the purchasers of the property who had used a fictitious name was in fact Reed. Reed thus lacks standing to contest this search.

 Reed also claims standing to challenge the search of the suitcase. Reed left a locked suitcase with Dr. Greg Boring, a person with whom Reed had been only briefly acquainted. Reed promised to retrieve it within three months but failed to do so. Nearly one year later, two men unknown to Boring informed him that they were to collect the suitcase for Reed. Boring refused to release it without Reed's permission. Shortly thereafter, a woman known to Boring as Reed's companion instructed Boring to release the suitcase to the men when they returned. No one returned to retrieve the suitcase, and no one provided further instruction. Approximately two months later, Boring released the suitcase to law enforcement officials at their request.

Finding that the facts "show[ed] an erosion of Reed's reasonable expectation of privacy," the lower court concluded that Reed had abandoned the suitcase by the time it was searched by law enforcement officers. We review the district court's finding of abandonment under the clearly

erroneous standard. *United States v. Winchester,* 916 F.2d 601, 603 (11th Cir. 1990). In determining abandonment, " 'the critical inquiry is "whether the person prejudiced by the search ... voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search.*" ' ". *Id.* (emphasis in original) (quoting *United States v. McKennon,* 814 F.2d 1539, 1545 (11th Cir.1987) (citation omitted)). For over one year Reed and his purported representatives promised but failed to retrieve the suitcase. We therefore find that the district court did not clearly err in its determination that Reed abandoned the suitcase and thus lacked standing to challenge its search. *See United States v. Hershenow,* 680 F.2d 847, 854 (1st Cir.1982).

Reed is properly before this Court to contest the search of his safety deposit box. A Mississippi judicial officer issued the search warrant for the safety deposit box on the basis of written affidavits and sworn oral testimony of law enforcement officers. The search yielded $210,000 in gold and currency. Reed contends that although the search warrant was issued by a state judge in accordance with state law, the search was federal in nature and therefore subject to the Federal Rules of Criminal Procedure. Reed specifically argues that the failure of the issuing judge to record or transcribe oral testimony offered in support of the warrants required suppression of the fruits of the search. *See* Fed.R.Crim.P. 41.[9]

A state search warrant must comply with federal standards if the search was "federal in execution." *United States v. Gilbert,* 942 F.2d 1537, 1539 (11th Cir. 1991); *United States v. Martin,* 600 F.2d 1175, 1180 (5th Cir.1979). A search is federal in execution if a federal official " 'had a hand in it.... The decisive factor ... is the actuality of a share by a federal official

in the total enterprise of securing and selecting evidence by other than sanctioned means.' " *Martin,* 600 F.2d at 1180 (quoting *Navarro v. United States,* 400 F.2d 315, 317 (5th Cir.1968) (citations omitted)). In the instant case, federal agents provided intelligence information to the state officers involved. The warrant was therefore "federal in character" and subject to Rule 41 of the Federal Rules of Criminal Procedure.

This Circuit has held that failure to meet the requirements of Rule 41 mandates a finding "that the affidavit supporting the search warrant was inadequate and the evidence seized under that warrant must be suppressed." *United States v. Acosta,* 501 F.2d 1330, 1334 (5th Cir.1974), *cert. denied,* 423 U.S. 891, 96 S.Ct. 188, 46 L.Ed.2d 122 (1975); *see United States v. Copeland,* 538 F.2d 639, 642 (5th Cir.1976). Since the *Acosta* decision, however, the Supreme Court in *United States v. Leon,* 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984), has ruled that "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing the affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."

Because Reed has alleged neither a breach of the magistrate's duties nor misconduct on the part of the participating law enforcement officers, suppression is appropriate only if the officers acted in bad faith. We therefore review *de novo* whether the officers acted in objective good faith. *United States v. Taxacher,* 902 F.2d 867, 871 (11th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1307, 113 L.Ed.2d 242 (1991). This inquiry is confined to determining whether reasonably well trained officers would have recognized that the issuance of the warrant was illegal despite the magistrate's authorization. *Id.*

---

**9.** Rule 41 provides in relevant part:

Before ruling on a request for a warrant the federal magistrate or state judge may require the affiant to appear personally and may examine under oath the affiant and any witness-

es the affiant may produce, provided that such proceeding shall be taken down by a court reporter or recording equipment and made part of the affidavit.

In the case at bar, only state officers conducted the search and offered sworn oral testimony before the state judicial officer. Both the process used to obtain the warrant and the standards used by the state court judge to evaluate the request for the warrant fully accorded with the applicable Mississippi laws. We find that it is objectively reasonable that Mississippi law enforcement personnel seeking a search warrant would follow Mississippi procedural rules rather than federal procedural rules. *See id.* at 872; *United States v. Accardo,* 749 F.2d 1477, 1480–81 (11th Cir.1985), *cert. denied,* 474 U.S. 949, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985). The lower court therefore properly admitted evidence obtained from the search of the safety deposit box.

## F. *Publicity did not deprive appellants of fair trial*

Appellants claim that in the wake of inflammatory and pervasive publicity, the district court deprived them of their right to a fair trial when it refused to (1) conduct an adequate voir dire, (2) order a change of venue, or (3) sequester the jury.

### 1. Voir dire

■■■ A trial court enjoys broad discretion in structuring an appropriate voir dire. *Cummings v. Dugger,* 862 F.2d 1504, 1507 (11th Cir.), *cert. denied,* 490 U.S. 1111, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989). We review the lower court's exercise of discretion to determine " 'whether the procedure used for testing juror impartiality created "a reasonable assurance that prejudice of the jurors would be discovered if present." ' " *Id.* (quoting *United States v. Tegzes,* 715 F.2d 505, 507 (11th Cir.1983) (citations omitted)). In cases involving extensive publicity, this Circuit has expressed a preference for an individual voir dire conducted by the trial court outside the presence of prospective jurors. *See id.* at 1508–10; *Coleman v. Kemp,* 778 F.2d 1487, 1542 (11th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The trial court in the instant case collectively questioned the venire and then conducted an extensive and searching individual voir dire outside the presence of prospective jurors. The court questioned individual jurors about drug use, attitudes toward drug use and the appellants, specific knowledge of the case and exposure to media accounts relating to the trial and to the appellants. The parties were then permitted to conduct their own individual voir dire.[10] We find that the lower court's voir dire reflects careful attention to ensuring discovery of jurors harboring prejudice. *See Jordan v. Lippman,* 763 F.2d 1265, 1282 n. 20 (11th Cir.1985).[11]

### 2. Change of venue and sequestration of jury

■■■ Appellants contend that the lower court's denial of their motions to change the venue of the trial and to sequester the jury deprived them of "a panel of impartial, 'indifferent' jurors." [12] *Irvin*

10. Appellants contend that the lower court in its individual voir dire at times asked "conditioning" questions that telegraphed the acceptable answer to the person being questioned. This argument is without merit. The trial court's questions clearly included those "calculated to elicit the disclosure of the existence of actual prejudice, the degree to which the jurors had been exposed to prejudicial publicity, and how such exposure had affected the jurors' attitude toward the trial." *Coleman,* 778 F.2d at 1542. Follow-up questions to ambiguous answers were inevitably more pointed but not leading. Moreover, the court afforded the defense adequate opportunity to alleviate this concern by allowing the defense a virtually unlimited range of questioning. *See id.*

11. Lehder also contends that the trial court erred by not probing all jurors who gave "equiv-

ocal" responses. This claim is meritless. A trial court may find that a juror has provided "a firm indication of impartiality" despite her "equivocations" during voir dire about the defendant's guilt or innocence. *Bundy v. Dugger,* 850 F.2d 1402, 1428 (11th Cir.1988).

12. Appellants also assert that heavy security arrangements in and around the courthouse deprived them of their constitutionally protected presumption of innocence. *See Allen v. Montgomery,* 728 F.2d 1409, 1412 (11th Cir.1984). Reasonable and necessary security precautions outweigh a defendant's "right to stand before the jury untainted by physical reminders of his status as an accused." *Id.* Significantly, the security arrangements did not include shackling of the appellants during trial. *Id.* In light of the death threats received by trial participants,

**1524**

v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); see Coleman v. Zant, 708 F.2d 541, 544 (11th Cir.1983). To show that the trial court abused its discretion by refusing to change the venue, the appellants must establish either that they were actually prejudiced or that the nature of the surrounding publicity requires a presumption of prejudice. United States v. De La Vega, 913 F.2d 861, 864 (11th Cir. 1990); Bundy v. Dugger, 850 F.2d at 1424–25. Only a showing of actual prejudice will demonstrate that the lower court abused its discretion by failing to sequester the jury. United States v. Hill, 496 F.2d 201, 203 (5th Cir.1974); see Baldwin v. Blackburn, 653 F.2d 942, 948 (5th Cir. Aug. 1981), cert. denied, 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982).

### a. Presumed prejudice

 A criminal defendant is not constitutionally entitled to trial by jurors ignorant about relevant issues and events. United States v. Padilla–Martinez, 762 F.2d 942, 951 (11th Cir.), cert. denied, 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 302 (1985); see Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). "The relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). In determining the existence of presumptive prejudice, a court must consider the totality of the circumstances, including the type of pretrial publicity, the time lapse between peak publicity and the trial, and the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case. Coleman v. Kemp, 778 F.2d at 1538; Calley v. Callaway, 519 F.2d 184, 208 (5th Cir.1975) (en banc). We note that "the presumptive prejudice standard ... is only 'rarely' appli-

cable ... and is reserved for an 'extreme situation.'" Coleman, 778 F.2d at 1537 (citations omitted). "In short, the burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." Id.; see Bundy, 850 F.2d at 1424.

The most egregious instances of pretrial publicity included characterizations of Lehder as a "drug kingpin," a term of art under the CCE statute. The media also accurately reported an in-court description of Lehder as a "narco-terrorist." References to Lehder's fascination with the Third Reich were only occasional and largely factual. See Cummings, 862 F.2d at 1511. Such publicity, while unfavorable, did not reach the extreme levels required to trigger a finding of presumed prejudice. See, e.g., Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (televising videotaped confession by defendant over local television station to audiences of 24,000, 52,000, and 29,000 in community of 150,000); Coleman, 778 F.2d 1487 (reporting defendant's confession in widely circulated newspaper in small rural community, accompanied by editorial discussing whether defendant could receive fair trial in that county).

The substantial lapse of time between the peak publicity and the trial also weighs against a finding of prejudice. See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976). The peak publicity in this case occurred at the time of Lehder's arrest in February 1987, and again when his retained counsel held a press conference in April 1987. Eight news items preceded Lehder's arrest. Between the time of Lehder's arrest in February 1987 and the time of the press conference in April, there were 85 media items.[13] From May 1987 until the beginning of the trial in October 1987, there were only 37 media items, not including six articles dealing with drugs and drug problems unrelated to the case. This

---

we find that the heavy security precautions were reasonable and necessary. See id.

**13.** Appellants base their claims of prejudicial publicity on the number and type of relevant

articles and press releases published by local and national newspapers, magazines and wire services. For the sake of simplicity we describe all such releases and articles as "media items."

total includes eight articles spawned by Lehder's letter to President Bush in which he offered to cooperate in exchange for immunity. Because the peaks of publicity occurred many months before the beginning of the trial, we fail to find a " 'barrage of inflammatory publicity immediately prior to' trial' " sufficient to demonstrate presumptive prejudice. *Patton v. Yount*, 467 U.S. at 1033, 104 S.Ct. at 2889 (quoting *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975)); *see Calley v. Callaway*, 519 F.2d at 208.

The jurors also credibly indicated that they could be impartial. In *Irvin v. Dowd*, 366 U.S. at 717, 81 S.Ct. at 1639, the Supreme Court found presumptive prejudice where 370 of 430 venire-persons expressed some opinion about the defendant's guilt during voir dire. In comparison, only eighteen of the 117 venire-persons in the instant case had formed an opinion about the defendants' guilt prior to trial. Moreover, the extensive voir dire revealed that most of the prospective jurors had not closely followed the media coverage of the case. In light of these facts we conclude that the eighteen jurors and alternate jurors chosen had credibly asserted that they could remain impartial. *See Calley v. Callaway*, 519 F.2d at 208–09.[14] We therefore find that the totality of the circumstances provides no basis for concluding that "the community was ... so inflamed and biased [ ] as to create a presumption of prejudice that a fair and impartial jury panel could not be impaneled." *United States v. De La Vega*, 913 F.2d at 865.

### b. Actual prejudice

■ Appellants likewise fail to demonstrate "actual prejudice." The actual prejudice standard requires appellants to estab-

lish that "one or more jurors entertained an opinion before the trial that the defendants were guilty and [to] show that these jurors could not put this prejudice aside and render a verdict based solely on the evidence presented." *Id.* When presented with a claim of actual prejudice, the reviewing court will not disturb the trial court's finding of juror impartiality absent a finding of "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984); *Cummings*, 862 F.2d at 1509.

Appellants speculate that those jurors who were exposed to third-party comments about the trial or who expressed a general dislike of drugs harbored prejudicial bias against appellants. This allegation finds no support in the record. No juror eventually impanelled expressed bias or hostility toward appellants. Even assuming that these jurors had preformed opinions of appellants' guilt, appellants provide no evidence showing that these jurors were unable to put aside such opinions. *See United States v. Cousins*, 842 F.2d 1245, 1248 (11th Cir.), *cert. denied*, 488 U.S. 853, 109 S.Ct. 139, 102 L.Ed.2d 111 (1988). To the contrary, all impanelled jurors asserted during their voir dire that they would determine the case solely on the evidence presented and would set aside any feelings they might have regarding relevant issues. Because the trial court's finding of impartiality was thus not manifest error, *see De La Vega*, 913 F.2d at 865; *Cummings*, 862 F.2d at 1510–11, the trial court properly denied appellants' motions for a change of venue and sequestration of the jury.[15]

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the convictions of Lehder and Reed.

---

**14.** Lehder also asserts that the trial court failed to adopt measures sufficient to safeguard against effects of publicity during the time of the trial. This contention is meritless. At the beginning and end of each trial day, the court inquired of the jurors whether they had "read, seen, or heard any information about this case from any [source] whatsoever." Receiving a negative answer to these questions, the court did not pursue the matter further. In so doing, the trial court followed precisely the prescribed minimal procedure for cases involving "a significant possibility of prejudice." *Jordan v.*

*Lippman*, 763 F.2d at 1281. The court furthermore *sua sponte* instructed the jury not to view television news programs such as "60 minutes," "20/20," and "48 Hours." We find that these measures were adequate to preserve the impartiality of the jurors. *See id.*

**15.** Appellants alternatively argue that the trial court erred in failing to invoke its supervisory powers to minimize prejudicial publicity of impermissible but not unconstitutional dimensions. A trial court is required to exercise such power in extraordinary circumstances not

COX, Circuit Judge, specially concurring:

I concur in the judgment and concur in the well-reasoned opinion Judge Johnson has written for the court except as to two issues. I write separately to voice my disagreement and concern on these two issues.

First, in reviewing the erroneous admission of evidence under Rule 404(b) and Rule 403 of the Federal Rules of Evidence, the majority opinion improperly blends two distinct standards of review—the "harmless error" standard under Fed.R.Crim.P. 52(a) and the "harmless beyond a reasonable doubt" standard applied to errors of *constitutional* magnitude. Second, I disagree with the majority's conclusion that the Mississippi state warrant used to search Reed's safety deposit box is "federal in character."

If a reviewing court finds that a district court has abused its discretion in admitting evidence in violation of Rule 403 or Rule 404(b), then its decision whether to uphold the conviction is properly reviewed under a harmless error standard. *See* Fed. R.Crim.P. 52(a).[1]

In considering the erroneous admission of evidence under Rule 404(b) and Rule 403, the majority opinion finds it "harmless" and cites *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); in one instance the majority finds admission of such evidence "harmless beyond a reasonable doubt."

*Chapman* was the seminal case in which the Supreme Court held that even errors implicating the accused's *constitutional* rights can be held harmless if the reviewing court can be certain that the error was harmless *beyond a reasonable doubt*. The Supreme Court did not then, nor have they since, suggested the abandonment of the traditional harmless error standard used

for considering nonconstitutional evidentiary errors.

I believe it important to keep intact the well-defined distinction between an evidentiary error that does not rise to the level of constitutional error and one that does. Error in the admission or exclusion of evidence is harmless if the error has "no substantial influence on the verdict." *United States v. Martinez,* 700 F.2d 1358, 1367 (11th Cir.1983). This standard is different from the "harmless beyond a reasonable doubt" standard adopted in *Chapman. See United States v. Jefferson,* 925 F.2d 1242, 1253–55 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 238, 116 L.Ed.2d 194 (1991) ("In deciding whether the admission of the pager bill was harmless, we must first determine the appropriate standard of error review. The choices are limited to the nonconstitutional harmless error standard of review pursuant to Fed.R.Crim.P. 52(a) or the constitutional standard established in *Chapman....* A harmless nonconstitutional error is one that did not have a 'substantial influence' on the outcome in trial nor does it 'leave one in "grave doubt" as to whether it had such effect.'"); *United States v. Drummond,* 903 F.2d 1171, 1174 (8th Cir.1990) (same), *cert. denied,* — U.S. —, 111 S.Ct. 759, 112 L.Ed.2d 779 (1991); *United States v. Seidel,* 620 F.2d 1006, 1013 (4th Cir.1980) (same). Nonetheless, the majority and I arrive at the same result. The admission of the evidence in question was harmless under the Fed.R.Crim.P. 52(a) standard.

I am also concerned about the holding that the warrant used in Mississippi to search Reed's safety deposit box was "federal in character" and subject to Rule 41 of the Federal Rules of Criminal Procedure. At the outset, I note Reed does not argue on this appeal that the warrant was gov-

---

presented by this case. *See United States v. Herring,* 568 F.2d 1099, 1103–06 (5th Cir.1978).

**1.** Rule 52(a) provides:

Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

This circuit has frequently applied this standard when considering the erroneous admission of evidence that has not implicated constitutional rights. *See, e.g., United States v. Cameron,* 907 F.2d 1051, 1059 (11th Cir.1990); *United States v. Hosford,* 782 F.2d 936, 939–40 (11th Cir.), *cert. denied,* 476 U.S. 1118, 106 S.Ct. 1977, 90 L.Ed.2d 660 (1986).

erned by Rule 41. Reed specifically concedes the issue in his appellate briefs.[2]

If this were an issue, I could not agree with the majority's conclusion that this state warrant was federal in character. Our court has not previously held a state warrant federal in character merely because some of the evidence relied on by the state judge to find probable cause was provided by federal officers. The Eleventh Circuit cases relied on by the majority do not support such an extension of the "federal in character" principle. In *Martin,* this court held that a warrant was federal in its execution because it was *executed by* a combination of state and federal agents. Similarly, in *Gilbert,* this court concluded that the warrant was federal in character because a *federal agent requested it* from the state attorney general and because two federal agents went along with state officers to *execute it.*

I find the Tenth Circuit's approach in *United States v. Bookout,* 810 F.2d 965, 967 (10th Cir.1987), to be more persuasive. *Bookout* involved a state warrant procured by state officers based mainly on information provided by a U.S. Customs officer. Although a U.S. Customs officer was the informant, "providing much of the information used by state officers to obtain the state warrant," the Tenth Circuit held that the warrant was not federal in character. *Id.* at 967. Viewed in practical terms, the Tenth Circuit found "it strains the bounds of common sense to find sufficient federal involvement to make a constitutional valid search conforming to state law federal in character merely because the state officers' informant was a federal officer conveying information gained in his official capacity." *Id.* at 967–68. The view the majority adopts today could inhibit appropriate federal-state cooperation in criminal prosecutions.

In the end, the majority holds that suppression was not mandated because the officers acted in objective good faith. I agree with that conclusion.

---

2. "[T]he testimony before the issuing judge was not recorded as required by Federal Rules of Criminal Procedure 41(c).... [I]t is a factor to be *considered....*" Brief for the Appellant Reed at 39 (emphasis supplied).

In the Reply Brief for Appellant, at 6–7, Reed says:

[T]he Government avoids or mischaracterizes Reed's essential arguments concerning the Mississippi search warrants.... The Government [argues] that the oral 'testimony' ... was not required to have been transcribed by Federal Rule of Criminal Procedure 41. This is another *false issue,* since Reed specifically *conceded same* while arguing that it was a *factor* to be considered in the totality of circumstances.
(Emphasis supplied).