**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jack Carlton REED, Donald Kenneth
Lady, Barry Kane, Defendants–
Appellants.**

No. 90–3076.

United States Court of Appeals,
Eleventh Circuit.

Jan. 20, 1993.

**1570**

Clyde M. Collins, Jacksonville, Fla., for Reed.

Lawrence E. Besser, Miami, Fla., for Kane.

Edward Dawkins, Jacksonville, Fla., for Lady.

Ernst D. Mueller, Asst. U.S. Atty., Jacksonville, Fla., for U.S.

Before KRAVITCH and HATCHETT, Circuit Judges, and BROWN *, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Defendants Jack Carlton Reed ("Reed"), Donald Kenneth Lady ("Lady") and Barry Kane ("Kane") appeal their convictions and sentences imposed under Title 21 of the United States Code. Reed was convicted of engaging in a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848 and of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846; Kane and Lady were convicted of conspiring to im-

---

\* Honorable Bailey Brown, Senior U.S. Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

port cocaine in violation of 21 U.S.C. § 963. We reverse Reed's CCE conviction on double jeopardy grounds. We uphold the remaining convictions.

I. Course of Proceedings

A. The Prior Lehder–Rivas Indictment

On September 18, 1981, Reed, Carlos Enrique Lehder–Rivas ("Lehder") and two co-defendants were charged in an eleven count indictment. Count One charged Lehder and Reed with engaging in a conspiracy to import cocaine from June 1978 to September 1980 in violation of 21 U.S.C. § 963.[1] Counts Two through Eleven charged Lehder with nine acts of importing and possessing cocaine with intent to distribute in violation of 21 U.S.C. §§ 952 and 841 and with engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848. Reed was arrested in Panama on February 7, 1987. Following seven months of testimony, a jury returned guilty verdicts on all counts. Reed was sentenced on July 20, 1988 to fifteen years imprisonment and fined $25,000. Lehder was sentenced to life imprisonment without parole to be served consecutively with 120 years imprisonment. He was also fined $100,000 and ordered to forfeit his property. The convictions of both Reed and Lehder were affirmed upon appeal. *United States v. Lehder–Rivas*, 955 F.2d 1510 (11th Cir.1992) ("Lehder/Reed trial").

B. The Reed, Kane, Lady Indictment

The defendants in the present drug conspiracy case, Reed, Lady, and Kane, along with thirty-two other co-defendants, were charged in a twelve count indictment returned on February 29, 1989.[2] Count One charged defendants with conspiring to distribute five or more kilograms of cocaine from 1974 through February 1989, in violation of 21 U.S.C. § 846. Count Two

charged Kane and Lady, but not Reed, with conspiring to import five kilograms or more of cocaine during the same time period, in violation of 21 U.S.C. § 963. Count Seven charged Reed with conducting a CCE from January 1978 through February 1987, in violation of 21 U.S.C. § 848. None of these three defendants were charged in the remaining counts of the 1989 indictment. Only five of the original thirty-five individuals indicted were named in the final prosecution.

During trial, prospective jurors were subjected to an intensive voir dire and the number of peremptory challenges available to both defense and prosecution was increased due to the overlap between the conspiracy alleged and the conspiracy proven in the highly publicized Carlos Lehder trial. It was established that all fifty-six prospective jurors were familiar with the Lehder trial and with Lehder's conviction. However, only thirteen had heard of the instant case, and four of these jurors were excused for cause. None of the nine remaining jurors who had been exposed to pretrial publicity served on the final jury, either due to defense or prosecutorial strikes or because these jurors were not reached in the selection process.

After a six-week trial, Reed was convicted on Count One, conspiracy to distribute, and Count Seven, engaging in a CCE. Lady and Kane were acquitted on Count One, conspiracy to distribute, but convicted on Count Two, conspiracy to import. The two other defendants, Herington and Stewart, were acquitted on all counts.

At sentencing, the court determined that the Federal Sentencing Guidelines were applicable to the offenses charged in Counts One and Two of the Indictment. Under these guidelines, Lady was subject to an imprisonment of 188 to 235 months. The

---

**1.** This court's opinion affirming Reed's earlier conviction states that Reed was charged with and convicted of "engaging in a conspiracy to import cocaine into the United States, in violation of 21 U.S.C.A. § 846." *United States v. Lehder–Rivas*, 955 F.2d 1510, 1515 (11th Cir. 1992). In reality, Reed was indicted and convicted of conspiracy to import under 21 U.S.C.A. § 963. This minor typographical error does not

affect the substance of *Lehder–Rivas* or of this case.

**2.** A superseding indictment was returned on June 29, 1989; however, the charges against Reed, Kane and Lady remained the same as in the original indictment.

court made a downward departure, however, based on 1) a comparison between Lady's role and the role of others who had been sentenced, 2) the age of the offense, and 3) the failure of the guidelines to account for a situation in which defendants who plead guilty receive non-guideline sentences yet those who go to trial are sentenced under the more stringent guidelines. Accordingly, Lady was sentenced to the mandatory minimum sentence of ten years.

These same factors caused the court to depart downward five levels during the sentencing of Kane who otherwise would have received 235 to 292 months imprisonment. Kane received a sentence of 144 months and a fine of $500,000.

In sentencing Reed, the district court adopted the probation officer's report which suggested three increases in Reed's base level offense. The report recommended increasing the base level by four points due to Reed's leadership role in the conspiracy. It recommended a further increase of two points for possession of firearms during the commission of the crime; this recommendation was based on a 1979 raid of Reed's residence in Norman's Cay, Bahamas, during which the Bahamanian police found weapons, ammunition and dynamite. The district court also adopted the report's suggestion that Reed's base level be enhanced by two points for obstruction of justice due to his involvement in a conspiracy to escape from custody prior to trial.

Reed was sentenced to life imprisonment on Count One, to run concurrently with the previously imposed fifteen-year sentence in the *Lehder/Reed* case for conspiring to import cocaine. He was also fined $2,000,-000. The district court also sentenced Reed to a consecutive life term on Count Seven (the CCE charge), a non-guideline offense.

Defendants appeal these convictions and sentences.

## II. Statement of the Facts

Defendants Reed, Lady and Kane were charged with a farreaching and longlasting conspiracy to import drugs into the United States. Much of the conspiracy involved Carlos Lehder, who managed the entire operation out of Norman's Cay in the Bahamas.

### A. Kane's Involvement

Kane, a pilot and attorney, first became involved in the Lehder drug business in 1976 when he agreed to fly smuggling runs for Lehder. In 1977, Kane flew several times from Norman's Cay to Colombia, each time acquiring several hundred kilograms of cocaine for importation into the United States. Between 1977 and 1985, George Jung ("Jung"), a major organizer of many cocaine importations, contacted Kane several times. Jung testified that Kane declined to participate in further smuggling activities when Jung contacted him in 1985 because "it was too risky and he no longer wished to involve himself in the business." Jung's nephew, Jose Ahmed ("Ahmed"), was standing next to Jung as he held this conversation from a public phone. Ahmed testified, in contrast to Jung, that Kane had indicated a willingness to smuggle drugs during the 1985 conversation as well as during a 1981 contact. Ahmed stated that the 1985 flight never occurred because Kane and Jung disagreed over price. Jung did not testify concerning any specific contact in 1981 but did state that he had asked Kane to fly drugs "half a dozen times" over the years since 1977 but that Kane had refused each time.

### B. Reed's Involvement

In 1978 Lehder asked Reed, a pilot, to smuggle drugs from Colombia into the United States, via Norman's Cay. Reed made at least ten such trips during 1978. Between 1978 and 1979, Reed ascended to a leadership role within the Lehder enterprise, directing other members' activities and coordinating the operation on Norman's Cay. In September 1979, the activities of the conspiracy were interrupted due to a Bahamanian police raid of Norman's Cay. Lehder was arrested during the raid, but Reed, who had been warned in advance, was not on the island when the

police arrived. Pursuant to a search warrant, the police confiscated guns, ammunition and dynamite from Reed's residence on the island. The degree of Reed's involvement following his return to Norman's Cay in the fall of 1980 is unclear.

In September 1981, Reed moved to Colombia and later moved to a remote area of Panama. In September of 1986, a confidential government informant, James Torres ("Torres"), traveled to Panama to discuss with Reed the distribution of cocaine through Arizona. During Torres' visit, Reed extensively discussed his association with Lehder. Forty days after Torres' departure, Reed contacted Torres in Arizona. Torres returned to Panama and discussed delivery of cocaine into the United States with Reed and two other men. One of these men, Gonzalo Mejia ("Mejia"), asked Torres to provide ground crews to offload planes in the United States and to locate places to store the cocaine. Reed was to receive payment based on the number of kilograms handled by Torres.

### C. Lady's Involvement

Sometime in 1986, Mejia asked Larry Triplett ("Triplett") to locate a ranch in Mexico that could be used as a smuggling waystation. Triplett recruited defendant Lady, who spoke Spanish and was an airplane mechanic, to help lease such a ranch. Once the property was located, Lady oversaw the day-to-day operations and security on the ranch and was paid $1,000 a month for his services.

Late in 1986 or early in 1987, Triplett informed Lady about his plans to use the ranch as a waystation for the importation of cocaine. Lady was told that he would receive $100,000 in addition to his salary if Triplett used the ranch for storing drugs. At one point, Lady was instructed by Triplett to deliver $3,200 to Torres who would use the money to purchase a "bin" for intermediate storage of smuggled cocaine. Lady had not been party to the conversation between Mejia and Triplett indicating the need for such a storage facility, but he had been present for the conversation between Triplett and Torres when the bin

was discussed. Lady delivered the money to Torres and indicated to Torres that he needed some alfalfa seed to firm up the ground for the runway. Triplett also asked Lady to procure approximately 800 gallons of Jet A fuel. Triplett informed Lady that the fuel was needed to refuel an aircraft coming from Colombia. Lady did not procure the aviation fuel.

Shortly after Lehder's arrest in Colombia on February 4, 1987, Mejia called off the operation and Triplett communicated this information to Lady. Lady left the ranch in May of 1987.

### III. Discussion

Appellants raise the following principal claims on appeal: (1) defendant Reed was denied his constitutional protection against successive prosecutions when he was charged with a CCE offense following his conviction for conspiracy to import; (2) all defendants were prejudiced by a variance between the crimes alleged in the indictment and the crimes proven at trial; and (3) defendant Kane was improperly tried despite his withdrawal from the conspiracy.

### IV. Double Jeopardy

In the 1988 Lehder/Reed trial, Reed was tried and convicted of a conspiracy to import cocaine in violation of 21 U.S.C. § 963. In 1989, the government charged Reed with engaging in a CCE, basing its claims partially on the acts and agreement proven during the previous conspiracy prosecution. Under the statute, a CCE is defined as:

a continuing series of violations of this subchapter or subchapter II of this chapter—(A) which are undertaken in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and (B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c)(2).

Reed claims that because he was prosecuted for a CCE offense following a prior prosecution and conviction for conspiracy to import, he was subjected to double jeop-

ardy in violation of his Fifth Amendment rights. Specifically, Reed argues that the government's section 848 prosecution was impermissibly based on the same agreement and the same conduct for which he already had been prosecuted under section 963.

### A. In General

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." This clause " 'protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' " *Albernaz v. United States*, 450 U.S. 333, 345, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)).

### B. *Garrett* and not *Grady* applies

■ The Supreme Court recently has dealt several times with the question of successive prosecutions and the consequent double jeopardy implications. *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) (upholding a CCE conviction based on overt acts consisting of substantive crimes for which ·defendant had already been convicted); *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (finding a double jeopardy bar if the subsequent prosecution requires proof of conduct that constituted an offense for which defendant has already been prosecuted). *Grady* and *Garrett* set forth different tests for determining whether a double jeopardy violation has occurred. Defendants argue that this court is bound by the more recent test announced in *Grady* while the government insists that *Garrett* has survived *Grady* and consequently governs this case.

The Supreme Court recently has indicated that *Garrett* survives *Grady* and governs cases involving conspiracy prosecutions that rely on substantive overt acts for which defendants have previously been prosecuted. *United States v. Felix*, —— U.S. ——, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992). In *Felix*, the Court discussed the difference between *Grady* and the longstanding authority of the *"Bayer–Pinkerton* line of cases". *Id.*, at ——, 112 S.Ct. at 1385. These cases, which include *Garrett*, deal with the distinction between a substantive offense and the conspiracy to commit it. The Court specifically stated that "[f]aced with the necessity of reconciling this longstanding authority with our language in *Grady*, we chose to adhere to the *Bayer–Pinkerton* line of cases...." *Id.*

Moreover, this circuit explicitly has held that *"Grady* did not reverse or overrule or in any way weaken the Court's previous decision in *Garrett v. United States." United States v. Link*, 921 F.2d 1523, 1530 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2273, 114 L.Ed.2d 724 (1991); *accord United States v. LeQuire*, 943 F.2d 1554, 1559 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). Instead, *Grady*'s "double jeopardy formulation barring successive prosecutions involving the same 'conduct' is, by its facts and the facts of the cases it relies upon, *limited to single act crimes*," leaving intact *Garrett*'s holdings concerning successive prosecutions involving complex statutory crimes such as CCE and RICO. *United States v. Gonzalez*, 921 F.2d 1530, 1537 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991) (emphasis added). *See also United States v. Eley*, 968 F.2d 1143 (11th Cir.1992) (adhering to *Felix* and following the *Bayer–Pinkerton* line of cases). Therefore, because the issue raised by Reed involves the complex statutory crime of CCE, this court must apply the *Garrett* double jeopardy analysis rather than the analysis set forth in *Grady*.

### C. *Garrett v. United States*

In *Garrett*, the Supreme Court held that a prior conviction for the substantive offense of marijuana importation does not pose a double jeopardy bar to a later CCE

prosecution that uses the prior conviction as a predicate offense. *Garrett*, 471 U.S. at 795, 105 S.Ct. at 2419. In reaching this conclusion, the Court announced a three-prong test for determining whether a defendant can be prosecuted for two different statutory crimes that involve the same course of conduct.

· First, a court must determine "whether [Congress] intended that each violation be a separate offense" and consequently intended to permit prosecution for both offenses. *Id.* at 778, 105 S.Ct. at 2411. Looking to the legislative history of the Comprehensive Drug Abuse, Prevention and Control Act of 1970, the *Garrett* Court concluded that Congress did intend "the CCE provision to be a separate criminal offense which was punishable in addition to, and not as a substitute, for the predicate offenses." *Id.* at 779, 105 S.Ct. at 2412.

Second, once it has been determined that Congress intended that both statutes punish the same conduct, a court must ask "whether a CCE offense is considered the 'same offense' as one or more of its predicate offenses within the meaning of the Double Jeopardy Clause." *Id.* at 786, 105 S.Ct. at 2415. Because it held that the elements necessary to prove a CCE violation are completely different from those necessary to prove the substantive crime of marijuana importation, the *Garrett* Court held that a double jeopardy violation had not occurred:

> Quite obviously the CCE offense is not, in any commonsense or literal meaning of the term, the 'same' offense as one of the predicate acts. The CCE offense requires the jury to find that the defendant committed a predicate offense, and *in addition* that the predicate offense was part of a continuing series of predicate offenses undertaken by the defendant in concert with five or more other persons, that the defendant occupied the position of an organizer or manager, and that the defendant obtained substantial income or resources from the continuing series of violations.

*Id.* at 786, 105 S.Ct. at 2415 (emphasis added).

Third, the *Garrett* Court asked whether the Double Jeopardy Clause bars cumulative punishments for the predicate act and the CCE. After addressing policy considerations and the legislative history, the Court held that "Congress intended separate punishments for the underlying substantive predicates and for the CCE offense." *Id.* at 794, 105 S.Ct. at 2419.

### D. Relevancy of *Garrett*

Although this court has stated that *Garrett* governs complex statutory crimes implicating double jeopardy issues, it does not definitively resolve the issue that Reed raises. In *Garrett*, the Court held that a CCE conviction may be based on predicate acts involving *substantive crimes* for which the defendant already has been prosecuted. This holding was based on the dissimilarity of the elements required to prove a CCE versus those required to prove a substantive crime. *Garrett* does not address the issue of a CCE prosecution based on the predicate act of drug conspiracy, an act similar to CCE, involving many of the same elements as CCE. The *Garrett* court specifically noted that a CCE offense is not the "same" as a substantive offense because a CCE offense, unlike a substantive drug offense, requires proof that the defendant acted "in concert" with five other people. *Id.* at 786, 105 S.Ct. at 2415. Quite similarly, a conspiracy conviction also requires proof of an agreement, unlike a conviction for a substantive offense. In fact, the Supreme Court expressly noted "the conceptual closeness" of sections 846 (conspiracy to distribute) and 848 (CCE) in *Jeffers v. United States*, 432 U.S. 137, 145 n. 11, 97 S.Ct. 2207, 2213 n. 11, 53 L.Ed.2d 168 (1977). Because of this "closeness" between conspiracies and CCEs, we must evaluate further whether double jeopardy bars a CCE prosecution based upon a previous drug-conspiracy conviction.

### E. Conspiracy as a lesser included offense

The Supreme Court has indicated and the Eleventh Circuit has held that drug

conspiracy, as defined by 21 U.S.C. § 846 or § 963, is a lesser included offense of CCE, and that it is a violation of double jeopardy to prosecute a defendant for the greater offense of CCE following a conviction of the lesser included offense of conspiracy. In *Jeffers,* the Supreme Court was confronted with the question of whether or not conspiracy is a lesser included offense of CCE and if so, whether this relationship between the two offenses prohibited separate prosecutions for each offense.[3] The *Jeffers* Court did not directly answer this question although it indicated that a section 846 offense is most likely a lesser included offense of 848.[4] Since *Jeffers* was decided, the former Fifth Circuit as well as the Eleventh Circuit have held that a section 846 offense is indeed a lesser included offense of section 848 offense:

> Although the facts in *Jeffers* made it unnecessary to settle definitively the issue of whether § 846 is a lesser included offense of § 848, [cite omitted] the Court's discussion of the issue indicates that the question would be answered affirmatively because § 848 requires proof of an agreement among the persons involved in the continuing criminal enter-

prise and thus requires proof of every fact necessary to show a violation under § 848 [sic] as well as proof of several additional elements.

*United States v. Stricklin,* 591 F.2d 1112, 1123 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979).[5] A conspiracy is a lesser included offense of section 848 because the "in concert" requirement of § 848 has been interpreted to "encompass the agreement required to prove a [section 846] conspiracy." *United States v. Michel,* 588 F.2d 986, 999 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Bollinger,* 796 F.2d 1394, 1403 n. 4 (1986), *opinion substituted in part on other grounds,* 837 F.2d 436 (11th Cir.), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988); *United States v. Brantley,* 733 F.2d 1429, 1436 (11th Cir. 1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985).

Moreover, "the double jeopardy clause bars a prosecution under section 848 where the predicate felony violation was a [ ] conspiracy and the section 848 prosecution is

**3.** Most courts addressing this issue have been confronted with the double jeopardy implications of prosecutions under section 846, conspiracy to distribute. This case involves a prior prosecution under section 963, conspiracy to import. The double jeopardy rationale is not affected by this minor difference given that the major similarity between conspiracy and CCE is the requirement that the government prove an agreement to violate the drug laws. Both conspiracy statutes are identically worded; they differ in that section 963 applies to conspiracies under Subchapter II "Import and Export", i.e. importation, while section 846 applies to conspiracies under Subchapter I "Control and Enforcement", i.e. distribution.

**4.** In *Jeffers,* the plurality of four plus a concurrence of one (who concurred on different grounds) determined that no double jeopardy violation occurred because a) the defendant had asked to be tried separately on each count due to his fear of Sixth Amendment violations concerning co-defendants at the conspiracy trial and b) it was not obvious to the government that section 846 is a lesser included offense of 848. 432 U.S. at 145 n. 11, 97 S.Ct. at 2213 n. 11. The plurality, however, suggested that conspiracy is probably a lesser included offense of CCE. *Id.* at 149, 97 S.Ct. at 2215–16. This

determination rests on a finding that the section 848 "in concert" element requires an agreement similar to that found in a section 848 drug conspiracy, and the most "likely explanation is that Congress intended the word 'concert' to have its common meaning of agreement in a design or plan." *Id.* Consequently, the plurality held that if "§ 848 does require proof of an agreement among the persons involved in the continuing criminal enterprise," then "§ 846 is a lesser included offense of § 848, because § 848 requires proof of every fact necessary to show a violation under § 846 as well as proof of several additional elements." *Id.* The dissent of four agreed that section 846 is a lesser included offense of section 848, but they believed that defendant's double jeopardy rights had been violated because the government should have realized that it could not try the defendant in two separate trials. Therefore, although *Jeffers* does not definitively state that 846 is a lesser included offense of 848, the combined opinions strongly indicate that this is the "most likely" relationship between the two offenses. *Id.*

**5.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

based on the *'same criminal agreement.'*" *United States v. Boldin,* 772 F.2d 719, 730 (11th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986) (decided after *Garrett*) (emphasis added); *Stricklin,* 591 F.2d at 1123. In other words, "[a]ny section 846 conspiracy for which [defendant] was subject to prior jeopardy cannot be used by the government in [a later] prosecution to satisfy the collaboration requirement of section 848." *Boldin,* 772 F.2d at 731. If the conspiracy serves as the predicate act for the CCE conviction and both crimes are "based upon the same criminal agreement, the conspiracy merges into the CCE conviction." *United States v. Jones,* 918 F.2d 909, 910 (11th Cir.1990) (citing *Jeffers* and *Boldin*); *see also Brantley,* 733 F.2d at 1436. Consequently, in a situation where a defendant is simultaneously tried and convicted of CCE and conspiracy to import, the conspiracy conviction and sentence must be vacated. *Jones,* 918 F.2d at 911; *Brantley,* 733 F.2d at 1436.

**F. Due Diligence Exception to the Double Jeopardy Bar**

 The above case law makes clear that the government will confront a double jeopardy bar when prosecuting a section 848 offense after obtaining a section 963 conviction unless the collaboration element of section 848 is satisfied by proving a newly discovered conspiracy. *Boldin,* 772 F.2d at 731.

Despite this double jeopardy bar to subsequent prosecutions, there are some instances in which the government can bring charges against a defendant for a greater offense after obtaining a conviction for a lesser included offense. In *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the Supreme Court laid out two exceptions to the double jeopardy bar discussed in *Jeffers* and other cases. First, a "commonly recognized exception" to the double jeopardy bar allows the government to bring a later prosecution "when all events necessary to the greater crime have not taken place at the time the *prosecution* for the lesser is begun." *Jeffers,* 432 U.S. at 151, 97 S.Ct. at 2216 (emphasis added);

*Garrett,* 471 U.S. at 791, 105 S.Ct. at 2417; *Brown,* 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7. Second, the government may also prosecute a defendant after a conviction for a lesser offense "when the facts necessary to the greater were not discovered despite the exercise of due diligence before the *first trial." Brown,* 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7 (emphasis added); *see also Stricklin,* 591 F.2d at 1123. Sixty years prior to *Brown,* the Supreme Court was confronted with a prime example of the need for the second exception to the double jeopardy bar:

> The death of the injured person was the principal element of the homicide, but was no part of the assault and battery. At the time of the trial for the [assault and battery] the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense.

*Diaz v. United States,* 223 U.S. 442, 448–49, 32 S.Ct. 250, 251, 56 L.Ed. 500 (1911). Given the facts in *Diaz,* the Court held that "[i]t follows that the plea of former jeopardy disclosed no obstacle to the prosecution for homicide." *Id.*

**G. Double Jeopardy in Reed's case**

Reed alleges that his double jeopardy rights have been violated because he was subjected to a CCE prosecution after he had already been convicted of a section 963 conspiracy. The government, in return, argues that the latter prosecution is not barred because the government alleged and proved acts occurring after the conspiracy dates involved in Reed's section 963 conviction.

 In effect, the government is attempting to invoke the *Brown* exception that permits multiple prosecutions if "all events necessary to the greater crime have not taken place at the time of the prosecution for the lesser is begun." *Jeffers,* 432 U.S. at 137, 97 S.Ct. at 2216 (citing *Brown,* 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7; *Diaz,* 223 U.S. at 448–49, 32 S.Ct. at 251). Courts have not stated explicitly whether the "time of prosecution" refers to the date

the indictment is returned or to the date trial begins. We believe, however, that this *Brown* exception applies to events occurring after trial has begun on the lesser crime but not to events occurring before this date.[6]

The Lehder/Reed trial proved a conspiracy transpiring between 1978 and 1980. In contrast, in this case the government alleged a CCE occurring between the years of 1974 and 1989. The government's indictment pointed to two specific acts committed by Reed after 1980: 1) a conversation in Panama in the fall of 1986 between Reed and an undercover policeman concerning the transportation of cocaine into the United States through Mexico and 2) a related discussion between Reed and Mejia, a major drug conspiracy organizer, concerning the building of a cocaine storage facility in Arizona. The government's briefs refer to a third act, not mentioned in the indictment, involving Reed's 1985 attempt to get a woman named Diane Thornhill to recruit cocaine distributors.[7] The government argues that Reed waived any future double jeopardy claims when he voluntarily committed further criminal acts beyond the dates alleged in the first indictment. *See Garrett*, 471 U.S. at 790, 792, 105 S.Ct. at 2417, 2418 ("One who insists that the music stop and the piper be paid at a particular point must at least have stopped dancing himself before he may seek such an accounting.").

The indictment in Reed's first prosecution was charged on September 18, 1981, but Reed was not arrested until February 1987. The six month trial in that case did not commence until late 1987. Because of the delay in Reed's prosecution under the 1981 indictment, the additional acts involved in the CCE allegation occurred at least one year prior to the first day of trial in that prosecution. In contrast, the government's subsequent prosecutions in *Garrett* and *Diaz* included evidence of acts and elements occurring after the initial prosecutions were begun. Garrett was indicted on a CCE charge which included allegations of acts occurring after he pleaded guilty to the substantive charge of importation. *Garrett*, 471 U.S. at 788, 105 S.Ct. at 2416. At the time of Diaz' trial for assault and battery the victim had not yet died. Therefore, the homicide had not been committed at the time of the prior prosecution. *Diaz*, 223 U.S. at 448–49, 32 S.Ct. at 251. In the case at hand, all acts in furtherance of the CCE occurred prior to Reed's prosecution for conspiracy to import. Therefore, the government cannot invoke here, as it did in *Garrett* and *Diaz*, the *Brown* exception to the double jeopardy bar based on acts committed after prosecution for the earlier offense.

■ Similarly, the government cannot rely on the second *Brown* exception to the double jeopardy bar because it has not shown that "the facts necessary to the greater were not discovered despite the

---

**6.** We reach this conclusion because the government has other opportunities to use information discovered between indictment and trial. First, the government may amend its indictment at any time before a trial on the merits. *Stricklin*, 591 F.2d at 1115 n. 1; *United States v. Millet*, 559 F.2d 253, 257–58 (5th Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 759 (1978); *United States v. White*, 524 F.2d 1249, 1253 (5th Cir.1975), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). Second, the government may, in a later prosecution on a greater charge, invoke the second *Brown* exception and use acts occurring after an indictment on a lesser charge, if despite due diligence, it has not discovered those facts in time to bring the greater charges during the earlier trial. *Brown*, 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7. As discussed later, the government has not shown that any of the overt acts alleged oc-

curred after the trial began on the lesser crime; it therefore cannot avail itself of the second *Brown* exception.

**7.** Even though the government presented an overt act at trial that was not mentioned in the indictment, Reed was still given constitutionally adequate notice of the offenses charged. "An indictment charging a continuing criminal enterprise is sufficient for constitutional purposes if it articulates in statutory language the elements of the violation.... The government need not provide defendant with all the overt acts that might be introduced at trial." *Lehder–Rivas*, 955 F.2d at 1519 (citations and quotations omitted); *United States v. Martell*, 906 F.2d 555, 558 (11th Cir.1990); *United States v. Alvarez–Moreno*, 874 F.2d 1402, 1410 (11th Cir.1989), *cert. denied*, 494 U.S. 1032, 110 S.Ct. 1484, 108 L.Ed.2d 620 (1990).

exercise of due diligence before the *first trial.*" *Jeffers*, 432 U.S. at 151, 97 S.Ct. at 2216 (emphasis added); *see also Diaz*, 223 U.S. at 448–49, 32 S.Ct. at 251; *Stricklin*, 591 F.2d at 1123. It is the government's responsibility to rebut the presumption of a double jeopardy violation. *Stricklin*, 591 F.2d at 1124. Yet the government has offered no evidence that it was unaware of the 1985 and 1986 alleged acts at the time of the Lehder/Reed trial. In fact, the government must have been very familiar with the 1986 acts given that these acts involved one of its own undercover police officers, and the 1985 acts occurred a full two years before the Lehder/Reed trial began.[8]

It is true that:

The attachment of jeopardy to one conspiracy prosecution under § 846 [or § 963] does not insulate a defendant from prosecution for conducting a continuing criminal enterprise in violation of § 848 if the government has evidence of a *separate conspiracy* with which to satisfy the "in concert" element of § 848.

*Stricklin*, 591 F.2d at 1124 (emphasis added); *accord Boldin*, 772 F.2d at 731. The government, however, did not present any evidence of Reed's participation in a separate conspiracy. In Count 7, the indictment charged Reed with violating 21 U.S.C. § 848 by:

knowingly, wilfully and intentionally [engaging] in a continuing criminal enterprise in that he did violate Title 21, United States Code, Section 841, 846, 952 and 963, which violations were part of a continuing series of violations of said statutes undertaken by the defendant in concert with at least five other persons, with respect to whom the defendant occupied a position of organizer, supervisor and manager, which violations include the violations set forth in Count One of this Indictment, the violations described in Overt Acts 38, 47, 56, 72 and 75 thereof, and *a conspiracy to import cocaine into the United States occurring from in or about January 1978 through in or about September 1980*, and from which continuing series of violations the defendant obtained substantial income and resources.

(emphasis added). The overt acts mentioned in the indictment refer to a series of flights from March 1978 through April 1979 between Norman's Cay and the United States or Colombia.[9] It is obvious that

---

8. In *Stricklin*, the former Fifth Circuit wrote that "[t]he government may, in accord with the exceptions referred to in *Brown v. Ohio*, rebut this presumption of a limited double jeopardy violation in the continuing criminal enterprise prosecution" if the government shows that the facts "necessary" to prove the second prosecution had not been discovered despite the exercise of due diligence. 591 F.2d at 1124 n. 5. In *Garrett*, the Supreme Court held by implication that additional facts involved in the latter prosecution need not be "necessary" because to so hold would be to "force the Government's hand" by limiting its discretion over when and upon what facts to prosecute. *Garrett*, 471 U.S. at 791, 797–98, 804–06, 105 S.Ct. at 2417, 2421, 2425. *Garrett*, therefore, broadened the *Brown* exception to include the late discovery of any fact (not just a necessary fact) useful in the prosecution of the later offense. Nevertheless, the government in this case cannot find solace in the *Brown* exception, even as modified by *Garrett*, because the government has not indicated that it was unaware of the 1985 and 1986 overt acts relied on in the CCE prosecution at the time of the prior conspiracy prosecution in late 1987.

9. The relevant excerpts of the indictment read as follows:

38. On or About March 6, 1978, Carlos Lehder, JACK CARLTON REED, and Russ O'Hara flew from Norman's Cay in the Piper Navajo aircraft, Registration N50RK, to an airstrip in Colombia south of the one at Rio Hacha and picked up approximately 600 to 700 pounds of cocaine. They then flew with the cocaine, plus two Colombians whom they planned to have illegally smuggled into the United States, to Pine Cay, Turks and Caicos Islands, where they rendezvoused with Andrew Richard Barnes, who was flying the Queen Air, Registration N923Q, and they transferred the cocaine and the two Colombian passengers to the aircraft Barnes was flying.

47. In or about late April or early May 1978, Carlos Lehder, JACK CARLTON REED, and Russ O'Hara flew the Piper Navajo aircraft, Registration N50RK, from Norman's Cay, Bahamas, to an airstrip in Colombia, with a stop en route at Aruba, picked up approximately 300 Kilograms of cocaine, and flew back with the cocaine to Norman's Cay, Bahamas.

56. From in or about mid–July 1978, through in or about December 1978, JACK CARLTON REED and Stephen C. Yakovac flew several loads of cocaine totalling approximately 1358 kilograms of cocaine from Norman's Cay, Bahamas, to a grass airstrip in Florida near

the indictment includes the events constituting the original importation conspiracy. Reed, however, has already been convicted under section 963, and the government is barred from using the agreement underlying that crime to prove the "in concert" requirement of 848. *Boldin*, 772 F.2d at 731.

■ The government has alleged one conspiracy separate from that involved in the prior prosecution, namely a conspiracy to distribute, complementing the conspiracy to import. But this allegation alone is not evidence of a *separate agreement*. Indeed, the Supreme Court has stated to the contrary that a "single narcotics conspiracy or agreement" may constitute the separate offenses of conspiracy to import marijuana and conspiracy to distribute marijuana without violating the double jeopardy clause. *Albernaz*, 450 U.S. at 339–44, 101 S.Ct. at 1142–45; *Boldin*, 772 F.2d at 726–27. Without more evidence of an additional, separate agreement, the government was barred from prosecuting Reed for the specific CCE alleged.

Not only has the government failed to prove a separate agreement, it has taken the contrary position, arguing that only one agreement underlay the entire fifteen year importation and distribution enterprise. In the section of its brief addressing the variance claim, the government points out that:

[A]fter proper instruction on single versus multiple conspiracies, the jury concluded that only the charged single conspiracies existed....

... The Indictment in this case charged an *enterprise* established to transport cocaine from producers in Colombia to the United States and to distribute it as directed by the producers.... The enterprise was implemented through *an importation conspiracy* and *a distribution conspiracy*. Throughout the period of these importation and distribution conspiracies, the goals of the participants remained the same.... The nature of the scheme also remained constant.... Finally the core participants in the conspiracies remained constant....

Brief of Appellee at 51–52. Consequently, the government undercuts its position on the double jeopardy issue by arguing that a single agreement underlay the entire Reed endeavor between the years of 1978 and 1987.

Based on the above arguments, we hold that the government has violated Reed's double jeopardy rights. The government neither alleged nor proved an agreement separate from or independent of the 1978–1980 agreement for which Reed has already been prosecuted.

### H. Due Diligence exception to prosecution

■ Even if Reed's CCE prosecution was not barred by double jeopardy, it would have been prohibited under the due diligence exception to section 848 prosecutions enunciated in *United States v. Boldin*, 772 F.2d at 732. In *Boldin*, the court implied that the government was subject to a due diligence requirement that prevented it from bringing multiple prosecutions, even in the absence of a double jeopardy bar, where the government "knew or should have known of the appellants' participation in a continuing series of violations of section 848" at the time of the prior prosecutions. *Id.* (citing *Jeffers*, 432 U.S. at 152, 97 S.Ct. at 2217 and *Stricklin*, 591 F.2d at 1124). A similar exception was mentioned

Lake Okeechobee, using a Cessna 206 aircraft, Registration N756LY. This cocaine was the same identified in the two previous overt acts.

72. In or about March 1979, following the events described in Overt Act 71, JACK CARLTON REED and Stephen C. Bluemel, using a V-tail Bonanza aircraft, Registration N18337, flew approximately 300 kilograms of cocaine from Norman's Cay, Bahamas to an airstrip near Lake Okeechobee, Florida.

75. In or about late March or early April 1979, Edward Hayes, Carlos Lehder and Leverett Merrill Francis loaded approximately 350 to 300 kilograms of cocaine into a Twin Beechcraft Bonanza aircraft, Registration N537ML, on Norman's Cay, Bahamas, and Ward and Francis, at Lehder's direction, piloted the aircraft to an airstrip at Astor Park in Lake County, in the Middle District of Florida, where the cocaine was off-loaded by a ground crew recruited by JACK CARLTON REED. This cocaine was then transported by motor vehicle from Astor Park to the "stash house" at Lighthouse Point, Florida, rented by Stephen C. Bluemel.

in *United States v. LeQuire*, 943 F.2d 1554 (11th Cir.1991), but the court permitted that prosecution because the government proved that it had insufficient information at the time of the first prosecution to bring the later prosecuted RICO charges. *Id.* at 1560.

By not raising the CCE charge during the conspiracy to import trial, the government failed to exercise the due diligence required by *Boldin*, 772 F.2d at 732. As mentioned above, the timing of Reed's prior prosecution suggests that the government was aware of all overt acts alleged against Reed before the start of the Lehder/Reed trial.

### I. Remedy

██ On the basis of the above findings, we hold that Reed's CCE conviction violated the Double Jeopardy Clause of the Constitution. This case is dissimilar to one in which the conspiracy charge and the CCE charge are brought simultaneously. In that situation, the conspiracy would merge into the CCE, and the conspiracy conviction and sentence, rather than the CCE conviction and sentence, would be vacated. *Jones*, 918 F.2d at 910 (citing *Jeffers* and *Boldin*); *Brantley*, 733 F.2d at 1436. We have no jurisdiction, however, to vacate a conspiracy sentence imposed in an earlier, completely different prosecution. Consequently, we reverse Reed's CCE conviction and CCE sentence because we have jurisdiction over these charges only.

### V. The Section 846 Distribution Conspiracy

██ In this litigation, Reed also was charged and convicted of conspiracy to distribute in violation of 21 U.S.C. § 846. If we had upheld the CCE conviction, we would have been compelled under *Jones* to merge the section 846 charge into the CCE conviction and to vacate the section 846 conviction and sentence. *Jones*, 918 F.2d at 910; *Brantley*, 733 F.2d at 1436. Because we already have vacated the CCE conviction, we leave the 846 conviction and sentence intact.

We reiterate that the conspiracy to distribute conviction does not present a double jeopardy problem vis a vis Reed's prior conviction for conspiracy to import. A single narcotics conspiracy or agreement may constitute the separate offenses of conspiracy to import marijuana and conspiracy to distribute marijuana without violating the Double Jeopardy Clause. *Albernaz*, 450 U.S. at 339–44, 101 S.Ct. at 1142–45; *Boldin*, 772 F.2d at 726–27. Therefore we need not disturb the conspiracy to distribute conviction on double jeopardy grounds.

### VI. Variance

██ A variance occurs when the evidence at trial establishes facts materially different from those alleged in the indictment. *United States v. Church*, 955 F.2d 688, 697 (11th Cir.), *cert. denied sub nom. Coppola v. United States*, — U.S. —, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992); *United States v. Caporale*, 806 F.2d 1487, 1499 (11th Cir.1986), *cert. denied*, 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987); *United States v. Johnson*, 713 F.2d 633, 643 n. 9 (11th Cir.1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). However, we will not reverse a conviction based on a variance unless the variance "(1) was material and (2) substantially prejudiced the defendant." *Church*, 955 F.2d at 697; *see also Caporale*, 806 F.2d at 1499. Here, all three defendants argue that they were subject to a material, prejudicial variance because the evidence admitted at trial proved a series of up to ten non-related conspiracies rather than the single conspiracy based on one criminal agreement that was alleged in the indictment. Accordingly, they contend that their convictions must be reversed.

### A. Single versus Multiple Conspiracies

██ In determining whether a material variance occurred, we view the evidence in the light most favorable to the government and ask whether a reasonable trier of fact could have found that a single conspiracy existed beyond a reasonable doubt. *Church*, 955 F.2d at 697; *Caporale*, 806 F.2d at 1500; *United States v.*

*White,* 569 F.2d 263, 266 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). *See generally United States v. Cole,* 755 F.2d 748, 754 (11th Cir.1985). In deciding whether the evidence at trial supported the existence of one conspiracy rather than several conspiracies, we rely on three factors: (1) whether a common goal existed, (2) the nature of the scheme underlying the crimes charged, and (3) the overlap of participants. *United States v. Khoury,* 901 F.2d 948, 956 (11th Cir.1990); *Caporale,* 806 F.2d at 1500; *White,* 569 F.2d at 266.

### B. Reed and Kane: The Three Factors

■ The government maintains that a common goal underlay all the overt acts charged in the indictment, namely the importation and distribution of cocaine via Colombia. The government also argues that the defendants maintained a constant scheme of using private jets to transport cocaine through a waystation (whether Antigua, the Bahamas or Mexico) into the United States.

In *Khoury,* the jury was presented with evidence similar to that presented in this case. There we found that:

> [T]here was indisputably a common goal, the importation of methaqualone into the United States, to be distributed in tablet form. The nature of the scheme remained the same as well: methaqualone would be shipped from China to a trans-shipping destination, either Hong Kong, Canada, or Haiti, and would then be smuggled into the United States, with air infiltration being the preferred method.

*Khoury,* 901 F.2d at 956. Here as in *Khoury,* the government has charged the defendants with importation of a certain drug (cocaine) via three waystation countries (Antigua, the Bahamas and Mexico). The uncanny similarity between the two factual scenarios binds us to the *Khoury* holding, as to Kane and Reed, that there was "indisputably a common goal ... [and]

[t]he nature of the scheme remained the same as well." *Id.*

The government also argues that it has proven the third factor necessary to establish a single conspiracy, namely a sufficient overlap of participants. The record shows that Reed and Kane were both involved with the overarching drug conspiracy either continuously or at numerous times during the fifteen years of alleged criminal activity.[10] Hence, the government has also met the participant overlap prong of the single conspiracy test. Therefore, as to Reed and Kane, we find that a reasonable jury could have found that a single conspiracy underlay the charged crimes. Because no variance existed with respect to Kane and Reed, we need not reach the prejudice issue.

### C. Lady

■ Lady did not have the same degree of involvement in the conspiracy as did Kane and Reed. He did not become associated with the Lehder/Mejia/Reed endeavors until 1986, twelve years after the date alleged in the indictment, when Triplett, acting at the request of Mejia, asked Lady to help locate a ranch in Mexico. Lady was paid $1,000 per month and his job was to oversee day to day ranching operations. Drugs were not actually smuggled through the Mexican ranch because Mejia called off the operation.

Lady, however, did participate in the scheme to potentially smuggle drugs. In reviewing his claim, we must decide whether the government presented sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that a conspiracy existed, that Lady knew about it and that he intentionally joined it. *Cole,* 755 F.2d at 764 (citing *United States v. Maletesta,* 590 F.2d 1379, 1381 (5th Cir. 1979) (en banc)). Lady need not have knowledge of all of the details of the conspiracy or be aware of all of the participants or participate in every stage. *Blumenthal v. United States,* 332 U.S. 539,

---

**10.** Kane's involvement includes the 1977 flights, to which he admits, as well as contested evidence of involvement in 1981 and 1985. *See* *supra* part IV. Reed's involvement pervades the conspiracy from 1978 through 1981 in addition to occasional acts through 1986.

558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947). All that is required is that he intentionally joined the conspiracy. *Cole*, 755 F.2d at 764.

As previously noted, the government presented sufficient evidence to establish that a single conspiracy existed. The common goal was to import cocaine into the United States and the evidence suggested that this scheme was one operation. The evidence also supported the contention that Lady intentionally and knowingly participated in the illegal enterprise.

Triplett testified that he informed Lady of his intention to use the Mexican ranch as a waystation for illegal drugs. Lady was promised $100,000 if Triplett succeeded in smuggling drugs through Mexico. Lady delivered $3,200 to Torres to pay for a bin to store the cocaine. He also asked Torres for seeds to improve the runway. Triplett asked Lady to procure aviator fuel for the plane from Colombia. Although Lady did not procure the fuel, the request was further evidence that Lady knew about the conspiracy and intentionally joined it. Finally, Lady did not leave the ranch after learning of the conspiracy. He departed in May, 1987, several months after the drug operation through Mexico had been called off. Thus, the evidence was sufficient to establish a single conspiracy and Lady's participation in the scheme.

### D. Prejudice to Lady from the Material Variance

██ Even if the evidence did not support the jury finding of a single conspiracy, Lady would have to prove that the variance prejudiced him by affecting his "substantial rights." *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), *overruled on other grounds, Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Warren*, 772 F.2d 827, 835 n. 12 (11th Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986). Such prejudice exists when (1) the proof at trial differs so greatly from the charges in the indictment that the defendant is unfairly surprised and has an inadequate opportunity to pre-

pare a defense, or (2) if there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury transferred evidence from one conspiracy to a defendant involved in another conspiracy. *Caporale*, 806 F.2d at 1500; *Warren*, 772 F.2d at 835 n. 12; *United States v. Hall*, 632 F.2d 500, 504 (5th Cir.1980).

Lady was not prejudiced in the manner suggested in the first prong of the prejudice test. The indictment was fully adequate to alert Lady to the crime alleged and he had sufficient opportunity to prepare an adequate defense. Moreover, Lady did not suffer prejudice under the second prong. The jury convicted Reed of conspiracy to distribute cocaine, but acquitted Lady and Kane of the distribution charge. Two other defendants at the trial were acquitted on all counts. Thus, the jury was able to separate the evidence and to treat each defendant individually. *See Caporale*, 806 F.2d at 1501 (the fact that the jury acquitted some of the defendants is proof that the jury was able to treat each defendant individually); *United States v. Rodriguez*, 765 F.2d 1546, 1553 (11th Cir. 1985) (no proof of prejudicial variance because defendant was acquitted on some charges).

### VII. Statute of Limitations

Kane argues that the district court should have granted Kane's motion for acquittal because the statute of limitations had run as to Kane's illegal activities. The applicable statute of limitations insulates a defendant from prosecution if the alleged crime was committed more than five years before the indictment is found. 18 U.S.C. § 3282 (1985).

██ However, Kane was involved in an ongoing conspiracy which, as to some defendants, spanned from 1974 through 1989. As an accused conspirator, Kane's participation is presumed to have continued until all objects of the conspiracy have been accomplished or until the last overt act has been committed by any of the conspirators. *Hyde v. United States*, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912);

*United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). A conspirator can overcome this presumption of continued participation by showing that he affirmatively withdrew from the conspiracy. *Hyde*, 225 U.S. at 369–70, 32 S.Ct. at 803; *Finestone*, 816 F.2d at 589; *United States v. Garcia*, 721 F.2d 721, 725 (11th Cir.1983). Consequently, the statute of limitations does not begin to run on a co-conspirator until the final act in furtherance of the conspiracy has occurred or until the co-conspirator withdraws from the conspiracy. *United States v. Benson*, 846 F.2d 1338, 1340 (11th Cir.1988).

Kane admits that he did not actively withdraw from the conspiracy as required by law. However, he argues that his involvement in the conspiracy ceased in 1977 and that his inaction over the next ten years constituted a withdrawal from the conspiracy. We resolve this question without reaching Kane's contention that an affirmative withdrawal can be inferred from an extended period of inaction.

Kane's entire statute of limitations defense is based on his supposed inaction for more than five years prior to the date of the 1989 indictment. In other words, Kane's argument assumes that the government has not sufficiently proven Kane's participation in any acts in furtherance of the conspiracy since February 19, 1984 (five years prior to the filing of the indictment). The government, however, did present sufficient evidence of further involvement by Kane within the statutory five years to thwart Kane's reliance on a statute of limitations defense.

The government alleges that Kane indicated a willingness to fly cocaine runs for Jung as late as March of 1985, but that Kane never flew because he and Jung could not agree on price.[11] The government's position is based on the testimony of Ahmed, Jung's nephew, who was standing next to Kane when Jung used a public phone to ask Kane to fly a shipment of cocaine. Kane presents a different version of his involvement in 1985, a version which was completely corroborated by Jung on direct examination by the prosecutor. Jung testified that he initiated a phone call to Kane but that Kane refused to cooperate because "it was too risky and he no longer wished to involve himself in the business."[12] Although Jung's testimony casts a shadow upon the government's allegation that Kane was "willing" to participate in 1985, the jury was entitled to credit Ahmed's testimony over the testimony of Jung. Hence, the government did present sufficient evidence, in the form of Ahmed's testimony, for a reasonable jury to believe that Kane was involved with the conspiracy within five years of the indictment. Consequently, Kane was not entitled to a statute of limitations defense.

VIII. Remaining Issues

The appellants make several additional arguments concerning their sentences and convictions. We find each of these allegations to be without merit. Reed claims: (1) that the district court erred by admitting extrinsic evidence of collateral crimes in violation of Fed.R.Evid. 404(b); (2) that the district court erred in denying his motion to suppress the evidence obtained in Mississippi; (3) that the district court erred in enhancing his sentence for three special offense characteristics; and (4) that there was insufficient evidence to support his CCE convictions.

A claim similar to Issue (1) was raised and dismissed by the court in *Lehder–Rivas*, 955 F.2d at 1516–1517. We agree with that court and deny Reed's claim. Issue (2) was raised in identical form in *Lehder–Rivas, id.* at 1521–23, and absent any newly discovered evidence affecting the seizure, we are bound by that court's affirmance of the district court's refusal to suppress, *id.* Issues (3) and (4) are similarly without merit.

---

**11.** That Kane never made the flights is irrelevant. His willingness to smuggle drugs indicates that he never withdrew from the conspiracy and he was still actively involved in the enterprise.

**12.** Kane's comment, if true, probably indicates a withdrawal. However, the comment was made in 1985, within the statute of limitations period, and therefore would not insulate Kane from prosecution.

All defendants claim that the district court erred in refusing to grant a change of venue due to the extent of pretrial publicity. We find this claim meritless due to the extensive voir dire conducted [13] and because the defendants in this case received less publicity than those in *Lehder–Rivas*, where no prejudice was found. *Id.* at 1525. Finally, we deny as meritless defendants' allegations that the district court erred in sentencing them under the Sentencing Reform Act.

## IX. Conclusion

For the foregoing reasons, we REVERSE Reed's CCE conviction imposed under 21 U.S.C. § 848 and VACATE the associated CCE sentence. We AFFIRM Reed's conviction for conspiring to distribute in violation of 21 U.S.C. § 846, Kane's conviction for conspiring to import in violation of 21 U.S.C. § 963 and Lady's conspiracy to import conviction imposed under 21 U.S.C. § 963.

---

**13.** *See supra* part I.