985 F.2d 1554
 20 UCC Rep.Serv.2d 401
 In re JOE MORGAN, INC., Debtor.
UTILITY CONTRACTORS FINANCIAL SERVICES, INC., Plaintiff,
Counter-Defendant-Appellee,
v.
AMSOUTH BANK N.A., Joe Morgan, Inc., Defendants,
Sunburst Bank, Defendant, Counter-Plaintiff-Appellant.
 No. 92-6301.
 United States Court of Appeals,
Eleventh Circuit.
 March 22, 1993.
 
 James E. Robertson, Jr., Armbrecht, Jackson, Demouy, Crowe, Holmes & Reeves, Mobile, AL, for defendant, counter-plaintiff-appellant.
 Victor T. Hudson, William W. Watts, III, Reams, Philips, Killion, Brooks, Schell, Gaston & Hudson, PC, Mobile, AL, for plaintiff, counter-defendant-appellee.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and JOHNSON, Senior Circuit Judge.
 CARNES, Circuit Judge:
 
 
 1
 Appellant Sunburst Bank ("Sunburst") appeals the district court's affirmance of an order of the bankruptcy court holding that: (i) Appellee Utility Contractors Financial Services ("UCON") was a holder in due course with respect to any checks received from account debtors of Joe Morgan, Inc. ("JMI") prior to July 17, 1989 and, therefore, had priority over Sunburst's prior perfected security interest in JMI's accounts receivable; and (ii) Sunburst was estopped from asserting its security interest in the proceeds of JMI's accounts receivable for the period beginning on July 17, 1989. We affirm the estoppel determination[1] but reverse the holding that UCON was a holder in due course of the pre-July 17, 1989 checks.
 
 I. STATEMENT OF FACTS
 
 2
 JMI was a corporation engaged in the telephone utility contracting business. In September 1988, JMI and Sunburst agreed in principle to enter into certain financing arrangements including a $1 million revolving line of credit. While the documentation for this financing was being prepared, Sunburst extended credit to JMI in the form of two "bridge" loans. These loans were secured by all of JMI's equipment, general intangibles, and accounts receivable. Although these loans were made in October 1988, Sunburst did not file a financing statement with the Secretary of State of Alabama--and thereby perfect its security interest--until March 15, 1989.[2] Sunburst placed no restrictions on JMI's use of the receivable accounts except to require that they be used in the "ordinary, normal course of business."
 
 
 3
 Sunburst became concerned about the JMI loans in December 1988, and was aware that JMI was searching for alternative financing sources. Sunburst consolidated the two bridge loans (the "Consolidated Loan"), but simultaneously downgraded this loan into a status which indicated a substandard performance trend. Sunburst subsequently learned that another financial institution had denied JMI's request for a line of credit and that AmSouth Bank[3] had declined to renew its existing loan to JMI.
 
 
 4
 During March and April 1989, Sunburst made clear to Joe Morgan, President of JMI, that it wanted to terminate its banking relationship with JMI and urged Morgan to find other sources of financing. According to its officers, Sunburst "anticipated [JMI's] bankruptcy unless JMI could find working capital and all of their creditors cooperate[d] in harmony."
 
 
 5
 Enter UCON, a newly-formed Nevada corporation engaged in the business of purchasing receivable accounts from telephone utility contractors. Under its program, UCON purchased (or "factored") a customer's receivables at a 5% discount of the face value of the account. UCON would then collect the account from the account debtor. The bankruptcy court found that UCON's factoring of JMI receivables began in March or April of 1989, and further found that JMI's account debtors always paid UCON by check. In re Joe Morgan, Inc., 130 B.R. at 333. The bankruptcy court also found that Sunburst did not learn of this factoring until July 17, 1989. Id.
 
 
 6
 Robert Watters, a principal of UCON, testified that when UCON began operations, he had not engaged previously in the factoring business and was unaware of the need to file or check for prior Uniform Commercial Code filings in connection with the factoring enterprise. Although UCON occasionally ran credit checks on its customers, it did not do so with JMI. Watters and UCON did not know of Sunburst's interests in JMI's receivables because, as the bankruptcy court found, "JMI did not inform UCON of Sunburst's prior security interest in JMI's accounts receivable." In re Joe Morgan, Inc., 130 B.R. at 333.
 
 
 7
 Temporarily reinvigorated by the working capital obtained through the UCON factoring, JMI was able to "renew" its Consolidated Loan with Sunburst (the "Renewal Loan") under terms permitting a longer period of repayment. JMI subsequently made two payments on the Renewal Loan. Douglas McCrory, a senior vice president of Sunburst and the credit officer charged with oversight of the JMI loans, testified that he "assume[d JMI was] getting the capital from conversion of accounts receivable."
 
 
 8
 At a chance meeting of Watters and McCrory on July 17, 1989, UCON and Sunburst "discovered" each other's involvement with JMI. During this meeting and a subsequent meeting on July 20, Watters and McCrory discussed various issues relating to their respective relationships with JMI. Thus, as of July 17, 1989, UCON's Watters had actual notice of Sunburst's prior security interest in JMI's receivables. Watters confirmed Sunburst's interest with a visit to the Alabama Secretary of State's office on July 19, 1989.
 
 
 9
 The parties' characterizations of the July 1989 meetings vary significantly. According to Sunburst, UCON principal Watters stated to Sunburst official McCrory that UCON was viewed as merely "a short term fix" for JMI. Sunburst claims that Watters misrepresented that JMI had $1.8 million in good receivables which would satisfy both AmSouth's and Sunburst's claims. In reality, the receivables were in the neighborhood of $1.4 million. The difference, Sunburst asserts, approximates the amount of JMI's indebtedness to Sunburst. Sunburst also complains that it was misled into believing that JMI was generating new receivables in an amount at least equal to the amount being factored.
 
 
 10
 UCON, on the other hand, contends that its principal, Watters, merely "estimated" the level of receivables as $1.8 million. UCON also contends that Watters indicated that UCON was unwilling to continue its factoring of JMI receivables beyond August 1, 1989. UCON claims that at the July meetings Sunburst raised no objection to UCON's continued factoring of JMI's receivables. UCON's Watters testified that Sunburst officials encouraged UCON to remain involved until August 1st because "everyone there ... understood ... [that] you can't sell a company that's in bankruptcy or that's being liquidated." Watters further testified that there was no threat of suit or other reservation of rights made by Sunburst during these meetings.[4]
 
 
 11
 The bankruptcy court found that the upshot of the July meetings was that Sunburst permitted UCON to "continue to factor JMI's accounts receivable until August 1, 1989 on the following conditions: 1) the funds received by JMI would be used to cover payroll; and 2) JMI would generate new receivables in an amount greater than the amount being factored." In re Joe Morgan, Inc., 130 B.R. at 333. McCrory of Sunburst conceded in his testimony that there was no dispute that each of these terms was met.
 
 
 12
 UCON continued to factor JMI receivables until August 31, 1989. Throughout this period, Sunburst and UCON had "almost daily" contact regarding UCON's factoring activities. Their relationship after the July meetings was characterized by UCON's Watters as one of cooperation regarding the transfer of funds to meet JMI's ongoing capital requirements. Watters testified that when a potential overdraft situation arose, someone from JMI or Sunburst (including McCrory) would call Watters and instruct him to purchase sufficient receivables to yield a certain dollar amount to be wire transferred to JMI's payroll account.
 
 
 13
 The bankruptcy court found that UCON factored a total of $2,511,481.01 in JMI's accounts receivable and collected $2,099,209.56. UCON factored $837,195.42 of the total from July 20, 1989 to August 31, 1989. The amount of the receivables factored but uncollected by UCON was $412,271.45. In re Joe Morgan, Inc., 130 B.R. at 334.
 
 
 14
 JMI filed a Chapter 11 petition on September 13, 1989. At the time of the petition, JMI owed Sunburst $399,910.00 in principal and $15,613.44 in interest. In re Joe Morgan, Inc., 130 B.R. at 333-34.
 
 
 15
 On September 26, 1989, UCON filed an adversary proceeding against AmSouth, Sunburst, and JMI to determine the priority of its claim. Sunburst counterclaimed seeking relief that included a declaration that Sunburst's prior perfected security interest was superior to UCON's interests, and an order compelling UCON to pay over to Sunburst all proceeds of accounts receivable of JMI which UCON received.
 
 
 16
 After a bench trial, the bankruptcy court held that UCON was a holder in due course ("HDC") of the pre-July 17, 1989 checks it had received and, therefore, had priority over Sunburst's prior security interest. The court further found that Sunburst was estopped from asserting its claims to the checks for accounts factored by UCON after the July 17, 1989 meeting. In re Joe Morgan, Inc., 130 B.R. at 335. The district court affirmed the judgment of the bankruptcy court.II. DISCUSSION
 
 A. ISSUES ON APPEAL
 
 17
 We address two questions in this appeal. The first one concerns UCON's status as an HDC with respect to checks received from JMI's account debtors for the accounts factored prior to the first meeting between UCON and Sunburst officials in July of 1989. As the district court correctly observed, "[t]he holder in due course issue is relevant only with regard to the accounts factored prior to July 17, 1989. It is undisputed by the parties that UCON had notice of the existence of Sunburst's security interest in the accounts factored after July 17, 1989." March 9, 1992 Order at 4 n. 1. As to the accounts factored before that meeting, we must initially decide if UCON is entitled to HDC status. If it is, then we must decide whether, pursuant to Ala.Code § 7-9-309, UCON, as an HDC, has a priority interest in checks it received in payment on accounts receivable which were purchased from JMI, notwithstanding Sunburst's senior, perfected security interest in those receivable accounts.
 
 
 18
 The second question we must address is whether Sunburst was equitably estopped from asserting its claims to the checks received by UCON from JMI's account debtors based on Sunburst's acquiescence in and encouragement of UCON's factoring activities after July 20, 1989.
 
 B. STANDARD OF REVIEW
 
 19
 Our "standard of review with regard to determinations of law, whether made by the bankruptcy court or by the district court, is de novo. With regard to the bankruptcy court's factual determinations, 'clearly erroneous' review applies." In re Sublett, 895 F.2d 1381, 1383 (11th Cir.1990). Because the district court "functions as an appellate court in reviewing the bankruptcy court's decision," this Court exercises de novo review over the district court's decision. Id. at 1383-84 (citations omitted).
 
 
 20
 The former Fifth Circuit explained previously the standard of review specifically applicable to a court's determination of HDC status:
 
 
 21
 While the Code also provides statutory meaning for the terms "taking with value" and "notice to purchaser," it is apparent that the application of these subsidiary definitions in order to determine whether a party is a holder in due course will very often turn heavily on the facts of a particular case. This is not to deny that a conclusion that a party is a holder in due course might depend largely or entirely on a question of law, which would of course come to us free of the "buckler and shield" of Rule 52(a). When, as in the case at bar, however, the determination was essentially factual, it should not be reversed unless clearly erroneous.
 
 
 22
 United States v. Second Nat'l Bank of North Miami, 502 F.2d 535, 546-47 (5th Cir.1974), cert. denied, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975) (citations omitted).
 
 
 23
 As we will discuss, Alabama has adopted an objective branch to the good faith test. We therefore must consider the impact of Alabama's rule on the standard of review. While we review subjective good faith holdings for clear error, see, e.g., Farmers & Merchants State Bank v. Western Bank, 841 F.2d 1433, 1444 (9th Cir.1987), a district court's determination of objective good faith should be reviewed de novo. Cf. United States v. Lehder-Rivas, 955 F.2d 1510, 1522 (11th Cir.) (in reviewing the denial of a motion to suppress evidence, we "review de novo whether the officers acted in objective good faith"), cert. denied, --- U.S. ----, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992).
 
 C. THE HOLDER IN DUE COURSE ISSUE
 
 24
 Both the bankruptcy court and the district court concluded that UCON was an HDC under Ala.Code § 7-3-302 with respect to the checks sent to UCON from JMI's account debtors. The district court analyzed this issue in some detail and rejected Sunburst's attack on each of the three elements of the HDC test. March 9, 1992 Order at 4-6. Sunburst again argues that "UCON fails to meet all of the requirements for holder in due course status as to checks it received from account debtors of JMI."
 
 
 25
 Ala.Code § 7-3-302 provides in material part:
 
 
 26
 (1) A holder in due course is a holder who takes the instrument:
 
 
 27
 (a) For value; and
 
 
 28
 (b) In good faith; and
 
 
 29
 (c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.
 
 
 30
 (2) A payee may be a holder in due course.
 
 
 31
 "Holder," in turn, is defined as "a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank." Ala.Code § 7-1-201(20). There is no dispute that UCON was a holder of the checks it received, so we examine each of the other three requirements for HDC status.
 
 1. The "For Value" Requirement
 
 32
 Alabama's Uniform Commercial Code ("UCC"), explains the "for value" requirement as follows:
 
 A holder takes the instrument for value:
 
 33
 (a) To the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process; or
 
 
 34
 (b) When he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due; or
 
 
 35
 (c) When he gives a negotiable instrument for it or makes an irrevocable commitment to a third person.
 
 
 36
 Ala.Code § 7-3-303 (emphasis added). The breadth of this provision was recognized by one commentator who observed that:
 
 
 37
 A holder takes for value when he takes the instrument in payment of any antecedent claim of any person, regardless of the circumstances from which the claim arose.... The antecedent debt may be the obligation of any person and is not restricted to the maker of the note given in payment of or as security for value.
 
 
 38
 5 Ronald A. Anderson, Anderson on the Uniform Commercial Code, § 3-303:14, at 536 (3d ed. 1984) [hereinafter Anderson on the UCC ] (citing Firth v. Farmers-Citizens Bank, 460 N.E.2d 191 (Ind.Ct.App.1984) (finding the value requirement satisfied where a payment by party A to a bank was applied to a note given by party B to the bank)).
 
 
 39
 The district court found that: "UCON paid value for each account assigned to it by JMI. UCON paid 95% of the face value of the uncollected accounts receivable. JMI received value because it obtained capital more quickly than it would have if it had attempted to collect the debts itself." March 9, 1992 Order at 5. In other words, UCON gave JMI 95 cents on the dollar and the time-value of those 95 cents. Obviously, JMI made the judgment that 95 cents today was of greater value than the prospect of $1.00 in 30 days.
 
 
 40
 The difficult part of the analysis is in deciding between two characterizations of what happened when UCON received the checks from the account debtors. Either the account debtors were paying UCON's "antecedent claim" against JMI when they paid UCON or, as the district court concluded, "[t]he checks were negotiated to UCON in payment of antecedent debts owed by the makers to JMI, a third party." March 9, 1992 Order at 5. If UCON purchased the accounts without recourse against JMI, UCON was really purchasing a chance at collecting $1.00 on a 95 cent investment. Under this scenario, claims of or against JMI were extinguished. Thus, Sunburst could legitimately argue that there was no "payment ... for an antecedent claim" as is required for HDC status.
 
 
 41
 The better approach focuses on the antecedent claims of UCON against the account debtors. As it did before the district court, in this Court Sunburst attempts to engraft onto § 7-3-303 the requirement that UCON "give value to the account debtors that wrote checks." Sunburst was properly criticized by the district court for failing to cite any "direct authority for this proposition."[5] March 9, 1992 Order at 5. Not only is Sunburst's view without precedential support, it also interjects the irrelevant concept of consideration. Under Sunburst's approach, an assignee of rights in accounts receivable would never be able to enforce those rights because consideration did not flow from the assignee to the account debtor. UCON purchased from JMI an antecedent claim JMI had against each account debtor. UCON then took checks in payment of those antecedent claims which had been assigned to it by JMI. The bankruptcy and district courts were correct in concluding that the checks were taken by UCON for value.
 
 2. The "Good Faith" Requirement
 
 42
 The UCC defines "good faith" as "honesty in fact in the conduct or transaction concerned." Ala.Code § 7-1-201(19). The majority rule, recognized by courts and commentators alike, holds that this definition creates a subjective test for good faith:
 
 
 43
 [T]he existence of good faith is determined by looking to the mind of the particular holder. It is sufficient that the holder honestly believed that there was nothing wrong, and the fact that there was reason to know that something was wrong is immaterial.
 
 
 44
 Anderson on the UCC, § 3-302:15, at 499. See also 1 James J. White & Robert S. Summers, Uniform Commercial Code, § 14-6, at 709 (3d ed. 1988) [hereinafter 1 White & Summers] ("At the conclusion of the scrimmaging among the Code drafters and the various proponents of different positions, it was clear that the draftsmen intended to adopt a subjective standard for the good faith test in Article Three"). This majority rule was illustrated in the case of Dallas Bank & Trust Co. v. Frigiking, Inc., 692 S.W.2d 163 (Tex.Ct.App.1985) in which the court found that "[i]t is not sufficient that [the holder] had knowledge that would put a reasonable person on inquiry which would lead to discovery. There must be actual knowledge of facts and circumstances which amounted to bad faith." Id. at 166; see also Farmers & Merchants State Bank, 841 F.2d at 1443 ("In applying this definition [of "good faith" under UCC § 1-201(19) ], '[t]he appropriate standard is a subjective one.' ") (citation omitted).
 
 
 45
 The district court clearly applied the majority rule subjective test in reaching the following conclusions:
 
 
 46
 Knowledge which would lead a reasonable person to inquire about and discover facts of another's claim is not bad faith; instead, the holder must subjectively act in good faith, no matter how negligent he may be in overlooking important facts. There are no facts establishing that UCON acted in bad faith when it factored JMI's accounts. The facts are also insufficient to show that UCON had actual notice of Sunburst's security interest.
 
 
 47
 March 9, 1992 Order at 6 (citation omitted).
 
 
 48
 The problem for UCON is that Alabama does not follow the majority rule which is the subjective test. Rather, Alabama has embraced a test that is composed of both a subjective component and an objective component. Two Alabama Supreme Court cases support the proposition that failure under either component of the test will deny a holder HDC status:
 
 
 49
 It is our conclusion that under the totality of the facts presented ... the Chancellor was justified in concluding that [the holder] had knowledge, or was possessed of facts, sufficient to impute such knowledge, that [the holder's] action in purchasing the Bell mortgage was questionable as to good faith.
 
 
 50
 United States Fin. Co. v. Page, 285 Ala. 645, 235 So.2d 791, 794 (1970) (emphasis added); see also United States Fin. Co. v. Jones, 285 Ala. 105, 229 So.2d 495, 498 (1969) (holding to the same effect). The foregoing holding appears to have been applied more recently by the Alabama Supreme Court in Strickland v. Kafko Mfg., Inc., 512 So.2d 714 (Ala.1987) where the court stated that:
 
 
 51
 [B]ecause [the holder] gave full value for the check, the only question is whether [the holder] took it in good faith. There was no evidence of any actual knowledge on [the holder's] part that the Strickland's pool had not been delivered. Neither is there any evidence of constructive knowledge that would justify a finding of lack of good faith.
 
 
 52
 Id. at 717 (emphasis added). But see id. at 722 (Beatty, J., dissenting) ("[T]he test for good faith is a subjective one which required [the holder] to prove to the satisfaction of the jury that it had a 'white heart' or was honest in fact. Thus, even the failure to inquire into what may be viewed objectively as suspicious circumstances may not amount to a lack of good faith.").
 
 
 53
 While UCON does meet the subjective good faith component, we hold that it has failed to satisfy the objective component. The record, including the following illustrative facts, adequately supports our conclusion that UCON was "possessed of facts, sufficient to impute" knowledge to UCON that another lender had a prior security interest in the accounts.
 
 
 54
 (i) UCON's principal, Watters, learned shortly after UCON began factoring JMI receivables that AmSouth claimed a security interest in those receivables, but failed to notify AmSouth of the factoring, and failed to take steps to determine if there were other security interests in JMI's receivables;
 
 
 55
 (ii) Watters testified that he knew two to three months before the July 17, 1989 meeting that financing statements had to be filed in the secretary of state's office. Nevertheless, UCON failed to conduct UCC searches of the filing records; and
 
 
 56
 (iii) UCON was aware of JMI's "desperate" financial condition when it began factoring the receivables, yet UCON failed to take any of its normal precautions it had used previously with other companies, such as reviewing UCC filing reports and credit analyses.
 
 
 57
 Reviewing the matter de novo, we disagree with the district court's conclusion that "[t]here is nothing [in] the facts listed by Sunburst above which would have led a reasonable third party such as UCON to believe that another party had a prior perfected security interest in JMI's accounts." March 9, 1992 Order at 6. In light of the facts known to UCON and reflected in the record, a "reasonable" receivables factoring company would have investigated the state filing records before undertaking to factor the receivables of a company in JMI's financial condition. We concur with the bankruptcy court's and the district court's conclusions that the record reflects that UCON acted with subjective good faith, i.e., "an empty head, but a white heart." Unfortunately for UCON, Alabama law incorporates the objective good faith requirement which does not countenance turning a blind eye, however empty the head and white the heart.
 
 3. The "Without Notice" Requirement
 
 58
 Both the bankruptcy and the district courts appear to have skirted around the notice prong of the HDC analysis. However, to achieve such status, UCON must have been found to have taken each check "[w]ithout notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." Ala.Code § 7-3-302(1)(c) (emphasis added). Sunburst clearly had a claim to these checks under Ala.Code § 7-9-306(2). The question thus becomes whether UCON had "notice" of that claim.
 
 
 59
 Under the UCC, "[a] person has 'notice' of a fact when:
 
 
 60
 (a) He has actual knowledge of it; or
 
 
 61
 (b) He has received a notice or notification of it; or
 
 
 62
 (c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists."Ala.Code § 7-1-201(25) (emphasis added). Professors White and Summers have observed that this definition of "notice" "introduces at least the flavor of the objective-subjective fight. It is a short step from that definition to say that one 'knows' what a reasonably prudent man in his circumstances 'knows.' " 1 White & Summers, § 14-6, at 711. The Alabama Supreme Court applied § 7-1-201(25) in Jones to conclude that an endorsee of a negotiable promissory note is an HDC "unless ... [he] was possessed of facts sufficient to impute knowledge, or unless he had 'knowledge of such facts that his action in taking the instrument amounted to bad faith.' " Jones, 229 So.2d at 498 (quoting Tri-D Acceptance Corp. v. Scruggs, 284 Ala. 153, 223 So.2d 273, 276 (1969)).
 
 
 63
 Because Alabama has included an objective component in its Article 3 "good faith" standard, the "good faith" and "notice" elements of the HDC test will frequently merge so that the answer to one inquiry is the answer to the other. See, e.g., In re Legel Braswell Gov't Sec. Corp., 695 F.2d 506, 512 (11th Cir.1983) (because, under New York's UCC Article 8, " 'actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith' ... the concepts of notice and good faith are interrelated in the assessment of bona fide purchaser status") (citations omitted). Whether or not this is what the UCC drafters intended, it is the law in Alabama. Thus, the facts recited by Sunburst and reflected in the record will also support a finding that UCON had reason to know of claims of other parties to the checks. At a minimum, it must be true that when UCON's Watters learned of AmSouth's perfected security interest in JMI's receivables, UCON had "notice" of a "claim to [the account debtor's checks] on the part of any person," namely AmSouth.
 
 
 64
 Because UCON does not meet the good faith and without notice requirements, it is not entitled to holder in due course status and, therefore, it has no shield against Sunburst's prior, perfected security interest in JMI's accounts receivable factored before July 17, 1989. Because we conclude that UCON was not an HDC, we do not reach the issue of whether, under Ala.Code § 7-9-309, the interest of an HDC in checks received from account debtors trumps the interest of a third party with a senior, perfected security interest in those accounts receivable.
 
 D. THE EQUITABLE ESTOPPEL ISSUE
 
 65
 UCON does not contend that it was an HDC as to JMI's accounts receivable factored after July 17, 1989, which is when UCON gained actual knowledge of Sunburst's prior security interest. Nonetheless, UCON argues, and the bankruptcy and district courts found, that Sunburst was equitably estopped from asserting its prior security interest insofar as accounts factored after July 17, 1989 are concerned.
 
 
 66
 We have previously articulated the scope of appellate review of a finding of estoppel:
 
 
 67
 Whether the established facts give rise to an estoppel is a question of law reviewable on appeal. However, the constituent elements of estoppel constitute questions of fact, and the district court's findings on these matters must be upheld unless clearly erroneous.
 
 
 68
 Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1323 (11th Cir.1989) (citations omitted). Under Alabama law, the constituent elements of equitable estoppel are:
 
 
 69
 1) the actor, who usually must have knowledge of the facts, communicates something in a misleading way, either by words or conduct, or silence; 2) another relies upon that communication; and 3) the other party would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.
 
 
 70
 Ex parte Baker, 432 So.2d 1281, 1285 (Ala.1983).
 
 
 71
 The bankruptcy court found that Sunburst and UCON agreed on July 20, 1989 that UCON should continue to factor JMI's receivable accounts provided that the funds generated by the factoring would be used for JMI's payroll and that JMI would continue to generate new receivables in excess of the amount being factored. Sunburst has acknowledged that these conditions were met. Based on its review of the record, the district court found:
 
 
 72
 At the July 20, 1989 meeting, Sunburst was fully apprised of UCON's activities. Nevertheless, Sunburst chose to allow UCON to continue factoring the collateral because it kept JMI solvent.... The court finds that there is no evidence of misrepresentation on the part of UCON in the record.
 
 
 73
 March 9, 1992 Order at 8-9. We review this conclusion de novo.
 
 
 74
 At the July 20, 1989 meeting, and thereafter, Sunburst clearly communicated to UCON that it acquiesced in UCON's continuing factoring of JMI accounts subject to two conditions, both of which were met. UCON clearly relied upon that communication and would be materially harmed if Sunburst were permitted to assert its claim that UCON should not have continued factoring JMI's accounts. We agree with the bankruptcy court and the district court that UCON has established all the elements of estoppel. We have only one minor disagreement with the holding of the bankruptcy court and the district court concerning estoppel. Those courts held that equitable estoppel applied as to accounts factored after July 17, 1989. This is three days too early, because it was not until the July 20, 1989 meeting that Sunburst agreed to permit UCON to continue factoring JMI's accounts receivable. UCON could not have relied on that communication from Sunburst before it was made.[6]
 
 
 75
 Sunburst does raise what amounts to a counter-estoppel argument. It asserts that because UCON at the July 17, 1989 meeting provided Sunburst with "critically inaccurate information regarding the level of [JMI's] receivables"--namely that JMI maintained $1.8 million in "good receivables" which would have been sufficient to satisfy Sunburst's claim--Sunburst cannot be estopped from asserting its prior perfected security interest. Sunburst further contends that but for UCON's misrepresentation about the amount of "good receivables" Sunburst would never have permitted the factoring to continue. Sunburst's theory apparently is that under Alabama law, "[t]he doctrine of equitable estoppel is available to protect innocent parties. A party's conduct 'must reflect the maxim of "clean hands" ' in order for that party to invoke the doctrine of equitable estoppel." Trammell v. Disciplinary Bd. of the Ala. State Bar, 431 So.2d 1168, 1172 (Ala.1983) (emphasis in original) (citations omitted).
 
 
 76
 The counter-estoppel issue, and the larger estoppel issue of which it is the decisive part, turn on what was said by UCON's Watters to representatives of Sunburst during the July 17 and 20 meetings regarding the amount of JMI's accounts receivable. Sunburst characterizes Watters' statements as "assurances" and "representations." UCON labels these statements as "estimates" and "opinions." The only evidence of these statements comes from the deposition and trial testimony of Watters and McCrory. Watters testified in deposition:
 
 
 77
 Q Do you remember Mr. McCrory pointing out to you the level of receivables at that point listed on JMI's books and the various claims to those receivables by AmSouth and Sunburst?
 
 
 78
 A (Watters) I don't specifically remember that. I remember that the level of receivables about that time was, in my estimation, about--
 
 
 79
 [interruption by counsel]
 
 
 80
 Q What--at the time you met with Mr. McCrory, what was your estimation as to the receivables on balance at JMI?
 
 
 81
 A As best I recollect, it was one point eight million.
 
 At trial, Watters testified as follows:
 
 82
 Q Did you estimate that JMI had approximately 1.8 million dollars in accounts receivables at the time that you met with Mr. McCrory in July 1989?
 
 
 83
 A Yes; I believe that's right.
 
 
 84
 Q And isn't it a fact that JMI did not have 1.8 million in receivables at that time, in good receivables?
 
 
 85
 A It turned out to be that, yes.
 
 
 86
 Q And in fact, that number was about $400,000 off of the true value of the receivables that were on hand at JMI?
 
 
 87
 A I'm not positive about that, but you're probably correct.
 
 
 88
 Q It was a substantial amount of money, wasn't it?
 
 
 89
 A Yeah, I believe so.
 
 
 90
 Q And you and Mr. McCrory discussed that 1.8 million in receivables that JMI supposedly had at the time that you met with him in July 1989; isn't that right?
 
 
 91
 A I don't recall the specific discussion. I know we did discuss it after that time.
 
 
 92
 Q And the 1.8 million figure was discussed?
 
 
 93
 A I don't specifically recall 1.8 million being discussed with Mr. McCrory. I can't answer that.
 
 
 94
 Q You'll stand by your earlier testimony, won't you?
 
 
 95
 A Yes.
 
 
 96
 Sunburst's McCrory testified at trial as follows:
 
 
 97
 Q Did Mr. Watters tell you that it was his opinion there were 1.8 million dollars in receivables on the company books?
 
 
 98
 A Yes, he did.
 
 
 99
 Q Was there anything else discussed that you remember at that meeting?
 
 
 100
 A I tried to pinpoint Mr. Watters as to how much he had factored. And he didn't have his records with him and he couldn't remember. And he didn't want to give a ballpark figure.
 
 
 101
 Q Did he ever give you a ballpark figure?
 
 
 102
 A No, sir--wait, Let me say this: Not at that time. It would have been probably maybe the 1st of August before I knew in ballpark what he had.
 
 
 103
 * * * * * *
 
 
 104
 Q If you had known at the time of the meetings in July that 1.8 million in receivables in fact did not exist, would you have allowed the factoring to continue?
 
 
 105
 A No, sir. We would have sued him.
 
 
 106
 Q (By the Court) Sued who?
 
 
 107
 A Joe Morgan, Incorporated.
 
 
 108
 This evidence provides an insufficient basis upon which to reverse the conclusion of the bankruptcy court and the district court that Sunburst should be estopped. In addition, the following factors militate in favor of affirming this portion of the judgment. First, the $1.8 million was merely an estimate. McCrory was well aware that the financial reporting of JMI was woefully inadequate. Indeed, McCrory testified that he and Watters agonized over the problem of JMI's inadequate financial reporting in their meetings. McCrory testified at trial that Watters "had much more indepth [sic], firsthand experience with [JMI's] books" than he did, yet failed to explain why he did not demand to see the documentation supporting the $1.8 million figure before blindly accepting the estimate of a man he had only just met.
 
 
 109
 Second, the JMI bridge loans had originally been made approximately ten months before the July 17 and 20, 1989 meetings. Sunburst had ample opportunity to compel JMI to surrender adequate financial reports. To allow Sunburst to seize upon Watters' apparently off-the-cuff estimate of the size of JMI's receivables as a means to avoid estoppel would excuse Sunburst for a problem that it had created by its own incompetence.
 
 
 110
 Third, the evidence does not support an inference that Watters gave his opinion or estimate with the expectation that Sunburst would rely on it or with the intent to deceive Sunburst.
 
 
 111
 Our review of the record leads us to agree with the district court's apt observation: "Sunburst want[ed] the best of both worlds." March 9, 1992 Order at 8. If JMI could be saved through UCON's factoring efforts, so be it, but Sunburst wanted UCON to function as a guarantor in the event of JMI's collapse. We find that the bankruptcy court and the district court were correct in holding that the doctrine of equitable estoppel barred Sunburst from asserting its security interest in the receivable accounts factored after the July 20, 1989 meeting. We affirm the estoppel determination, but modify the effective date of the estoppel to July 20, 1989.
 
 III. CONCLUSION
 
 112
 Alabama has adopted a test for the "good faith" of a holder in due course that includes both an objective and a subjective component. From all the facts and circumstances known to UCON at the time in question, UCON had reason to know that a claim to the checks existed; therefore, UCON fails the objective good faith component, as well as the notice requirement, and thus was not an HDC. The judgment of the district court that UCON was entitled to the proceeds of JMI's accounts receivable during the period before July 17, 1989 is REVERSED.
 
 
 113
 Because the record amply demonstrates that UCON and Sunburst agreed that UCON should continue to factor JMI's accounts after July 20, 1989 as a means of keeping JMI afloat, and because UCON's statements during the July 1989 meetings did not rise to the level of misrepresentations, the judgment of the district court that Sunburst was equitably estopped from asserting claims that are inconsistent with the UCON-Sunburst agreement is AFFIRMED, insofar as it applies to accounts factored after July 20, 1989.
 
 
 114
 This case is AFFIRMED in part as modified, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 As will be explained infra, while the district court held that estoppel applied to accounts factored after July 17, 1989, we hold that it applies to accounts factored after July 20, 1989
 
 
 [2]
 This is but one example that all was not well with Sunburst's internal operating procedures. The bank officer who actually handled the JMI loans was dismissed, in part, because of his failure to ensure the UCC filings were promptly made
 
 
 [3]
 AmSouth held a first lien on JMI's receivable accounts which was superior to Sunburst's. AmSouth's superior interest was not disputed. The proceeds of successive cash collateral orders were used to retire AmSouth's secured debt of $634,071.66 in principal and $19,674.63 in interest. In re Joe Morgan, Inc., 130 B.R. 331, 333-34 (Bankr.S.D.Ala.1991)
 
 
 [4]
 McCrory confirmed this when he testified that had he threatened Watters, "[i]t would make sense that he would check out" of the business of factoring JMI receivables
 
 
 [5]
 Sunburst does cite Wilson v. Weaver, 16 Ala.App. 249, 77 So. 238 (1917), a pre-UCC case in which the court rejected a plaintiff's attempt to collect from the maker of a note that had been endorsed to the plaintiff because the "evidence showed that no value was paid [by the endorsee-plaintiff] for the note." Id. at 239. This case is factually and legally distinguishable. UCON did give value in this case, albeit not to the makers of the checks. The Wilson case requires nothing more
 
 
 [6]
 We leave it to the district court to determine whether any accounts were factored on July 18, 19, or 20, 1989. If not, then our disagreement with that aspect of the district court's holding is immaterial. If there was factoring on those dates, then the district court should adjust its judgment accordingly